## UNITED STATES *v.* JOHNSON

No. 80–1608.   Argued February 24, 1982—Decided June 21, 1982

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, POWELL, and STEVENS, JJ. joined. BRENNAN, J., filed a concurring opinion, *post*, p. 563. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined, *post*, p. 564.

*Elliott Schulder* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey,* and *Patty Merkamp Stemler.*

*John F. Walter,* by appointment of the Court, 454 U. S. 1028, argued the cause and filed a brief for respondent.

JUSTICE BLACKMUN delivered the opinion of the Court.

In *Payton* v. *New York,* 445 U. S. 573 (1980), this Court held that the Fourth Amendment[1] prohibits the police from making a warrantless and nonconsensual entry into a sus-

---

[1] The Fourth Amendment reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

pect's home to make a routine felony arrest. The question before us in the present case is whether the rule announced in *Payton* applies to an arrest that took place before *Payton* was decided.

# I

Special Agents Hemenway and Pickering of the United States Secret Service suspected respondent Raymond Eugene Johnson and his codefendant, Oscar Joseph Dodd, of attempting to negotiate a misdelivered United States Treasury check.[2] Proceeding without an arrest warrant, on May 5, 1977, the two agents went to respondent's Los Angeles home and waited outside. Shortly thereafter, respondent and his wife arrived and entered the house.

The agents drew their weapons, approached the doorway and knocked, identifying themselves by fictitious names. When respondent opened the door, he saw the two agents with their guns drawn and their badges raised. Respondent permitted the agents to enter the house. While one agent stood with respondent in the living room, the other searched the premises. The agents then advised respondent of his constitutional rights and interrogated him. When respondent revealed his involvement in the taking of the misdelivered check, the agents formally arrested him. Respondent later signed a written statement admitting his involvement with the check.

Before trial, respondent sought to suppress his oral and written statements as fruits of an unlawful arrest not sup-

---

[2] On March 30, 1977, the United States Postal Service mistakenly delivered to Lena Kearney a Treasury check for $4,681.41, payable to Elihu Peterson. Kearney and her sister-in-law sought Dodd's assistance in cashing the check. Accompanied by respondent Johnson and another man, Dodd went to Kearney's residence to discuss methods of cashing the check. The three men eventually departed, taking the check with them.

After Kearney and her sister-in-law related the foregoing events to Special Agent Hemenway, he obtained a warrant for Dodd's arrest. He, however, did not obtain a warrant to arrest respondent. See 626 F. 2d 753, 754–755 (CA9 1980).

ported by probable cause. The United States District Court for the Central District of California found respondent's arrest to be proper and admitted the evidence. App. 7. A jury then convicted respondent of aiding and abetting obstruction of correspondence, in violation of 18 U. S. C. §§ 2 and 1702.[3] The imposition of respondent's sentence was suspended in favor of five years' probation.

By an unreported opinion filed December 19, 1978, the United States Court of Appeals for the Ninth Circuit affirmed the judgment of conviction. Acknowledging that "[i]t certainly would have been preferable had the agents obtained a warrant" for respondent's arrest before entering his residence, the court nonetheless ruled that "if probable cause exists for the arrest, [respondent's] constitutional rights were not violated by the warrantless arrest, even though there may have been time [for the agents] to have obtained a warrant for his arrest." App. to Pet. for Cert. 26a–27a.

On April 15, 1980, while respondent's petition for rehearing was still pending before the Ninth Circuit, this Court decided *Payton* v. *New York, supra.*[4] On September 2,

---

[3] The jury acquitted respondent on a separate count of aiding and abetting the receipt of stolen Government property. See 18 U. S. C. §§ 2, 641. Respondent's codefendant Dodd was convicted on both counts. In an unreported decision, Dodd's conviction was affirmed summarily on appeal, and is not before us. See *United States* v. *Dodd*, No. 79–1030 (CA9 Feb. 4, 1980), rehearing denied, Mar. 5, 1980.

[4] The Court noted probable jurisdiction in *Payton* on December 11, 1978. 439 U. S. 1044. On March 5, 1979, the Ninth Circuit deferred decision on respondent's petition for rehearing and rehearing en banc pending this Court's decision in *Payton.* App. 8. The Court heard argument in *Payton* on March 26, 1979, but restored the case to the calendar for reargument. See 441 U. S. 930 (1979).

On August 20, 1979, the Ninth Circuit reaffirmed respondent's conviction, in the process amending its initial opinion and denying respondent's petition for rehearing. App. to Pet. for Cert. 14a. Respondent timely filed a second petition for rehearing and suggestion for rehearing en banc, which was still pending in the Court of Appeals when *Payton* was decided.

1980, the Ninth Circuit granted respondent's petition for rehearing, withdrew its prior opinion, and on the strength of *Payton*, now reversed the judgment of conviction. 626 F. 2d 753. "In light of the strong language by the Court in *Payton* emphasizing the special protection the Constitution affords to individuals within their homes," the Court of Appeals held that "the warrantless arrest of Johnson, while he stood within his home, after having opened the door in response to false identification by the agents, constituted a violation of his Fourth Amendment rights." *Id.*, at 757. The Government petitioned for rehearing, arguing that the principles of *Payton* should not apply retroactively to an arrest that had occurred before *Payton* was decided. The Court of Appeals disagreed, denied the petition for rehearing, and amended its opinion to clarify that *Payton* did apply retroactively. App. to Pet. for Cert. 12a.[5]

The Government sought review in this Court. We granted certiorari to consider the retrospective effect, if any, of the Fourth Amendment rule announced in *Payton*. 454 U. S. 814 (1981).[6]

---

[5] In a decision issued three months before its initial ruling here, a different panel of the Ninth Circuit had anticipated *Payton*, holding that "absent exigent circumstances, police who have probable cause to arrest a felony suspect must obtain a warrant before entering a dwelling to carry out the arrest." *United States* v. *Prescott*, 581 F. 2d 1343, 1350 (1978). Upon denial of the Government's petition for rehearing in respondent's case, the Court of Appeals made clear that its post-*Payton* reversal of respondent's conviction "rests chiefly upon basic principles common to our decision in *Prescott* and that of the Supreme Court in *Payton*." App. to Pet. for Cert. 13a. The court also noted that it had already held that its ruling in *Prescott* should apply retroactively. See *United States* v. *Blake*, 632 F. 2d 731 (1980).

[6] For the purposes of this case, the Government assumes the correctness of the Court of Appeals' ruling that, if applied to these facts, *Payton* would require exclusion of respondent's statements. Brief for United States 12–13, n. 6. We therefore need not examine the Court of Appeals' conclusion on that issue.

## II

"[T]he federal constitution has no voice upon the subject" of retrospectivity. *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358, 364 (1932). Before 1965, when this Court decided *Linkletter* v. *Walker*, 381 U. S. 618, "both the common law and our own decisions recognized a general rule of retrospective effect for the constitutional decisions of this Court . . . subject to [certain] limited exceptions." *Robinson* v. *Neil*, 409 U. S. 505, 507 (1973), citing *Norton* v. *Shelby County*, 118 U. S. 425, 442 (1886), and *Chicot County Drainage Dist.* v. *Baxter State Bank*, 308 U. S. 371 (1940).[7]

In *Linkletter*, however, the Court concluded "that the Constitution neither prohibits nor requires [that] retrospective effect" be given to any "new" constitutional rule. 381 U. S., at 629. Since *Linkletter*, the Court's announcement of a constitutional rule in the realm of criminal procedure has frequently been followed by a separate decision explaining whether, and to what extent, that rule applies to past, pending, and future cases. See generally Beytagh, Ten Years of Non-Retroactivity: A Critique and a Proposal, 61 Va. L. Rev. 1557 (1975).

*Linkletter* itself addressed the question whether the Fourth Amendment exclusionary rule of *Mapp* v. *Ohio*, 367 U. S. 643 (1961), should apply to state convictions that had become final before *Mapp* was decided.[8] At the outset, the *Linkletter* Court noted that cases still pending on direct review when *Mapp* was handed down had already received the

---

[7] The pre-1965 requirement that all constitutional rules receive full retroactive application derived from the Blackstonian notion "that the duty of the court was not to 'pronounce a new law, but to maintain and expound the old one.'" *Linkletter* v. *Walker*, 381 U. S. 618, 622–623 (1965), citing 1 W. Blackstone, Commentaries 69 (15th ed. 1809).

[8] "By final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed [or a petition for certiorari finally denied, all] before our decision in *Mapp* v. *Ohio*." *Linkletter* v. *Walker*, 381 U. S., at 622, n. 5. See also *Tehan* v. *United States ex rel. Shott*, 382 U. S. 406, 409, n. 3 (1966).

benefit of *Mapp*'s rule. See 381 U. S., at 622, n. 4, citing *Ker* v. *California*, 374 U. S. 23 (1963); *Fahy* v. *Connecticut*, 375 U. S. 85 (1963); and *Stoner* v. *California*, 376 U. S. 483 (1964). This limited retrospective application of *Mapp* was consistent with the common-law rule, recognized in both civil and criminal litigation, "that a change in law will be given effect while a case is on direct review." 381 U. S., at 627, citing *United States* v. *Schooner Peggy*, 1 Cranch 103 (1801).

To determine whether a particular ruling should also extend to cases that were already final, *Linkletter* directed courts to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." 381 U. S., at 629. Employing that test, the Court concluded that the *Mapp* rule should not apply to convictions that had become final before *Mapp* was decided.

The following Term, in *Tehan* v. *United States ex rel. Shott*, 382 U. S. 406 (1966), the Court applied *Linkletter*'s analysis to hold the Fifth Amendment rule of *Griffin* v. *California*, 380 U. S. 609 (1965) (barring comment on a state defendant's failure to testify), nonretroactive to judgments of conviction made final before *Griffin* was decided. The Court again found no "question of the applicability of the *Griffin* rule to cases still pending on direct review at the time it was announced." 382 U. S., at 409, n. 3, citing *O'Connor* v. *Ohio*, 382 U. S. 286 (1965). Thus, after *Linkletter* and *Shott*, it appeared that all newly declared constitutional rules of criminal procedure would apply retrospectively at least to judgments of conviction not yet final when the rule was established.

In *Johnson* v. *New Jersey*, 384 U. S. 719 (1966), and *Stovall* v. *Denno*, 388 U. S. 293 (1967), however, the Court departed from that basic principle. Those cases held that, in the interest of justice, the Court may balance three factors to determine whether a "new" constitutional rule should be ret-

rospectively or prospectively applied: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Id.*, at 297. See also *Johnson* v. *New Jersey*, 384 U. S., at 728. Because the outcome of that balancing process might call for different degrees of retroactivity in different cases, the Court concluded that "no distinction is justified between convictions now final . . . and convictions at various stages of trial and direct review." *Stovall* v. *Denno*, 388 U. S., at 300. See *Johnson* v. *New Jersey*, 384 U. S., at 732.

Because the balance of the three *Stovall* factors inevitably has shifted from case to case, it is hardly surprising that, for some, "the subsequent course of *Linkletter* became almost as difficult to follow as the tracks made by a beast of prey in search of its intended victim." *Mackey* v. *United States*, 401 U. S. 667, 676 (1971) (separate opinion of Harlan, J.). At one extreme, the Court has regularly given complete retroactive effect to new constitutional rules whose major purpose "is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials." *Williams* v. *United States*, 401 U. S. 646, 653 (1971) (plurality opinion). See also *id.*, at 653, n. 6; *Brown* v. *Louisiana*, 447 U. S. 323, 328–330 (1980) (plurality opinion); *Hankerson* v. *North Carolina*, 432 U. S. 233, 243 (1977); *Gosa* v. *Mayden*, 413 U. S. 665, 679 (1973) (plurality opinion); *Ivan V.* v. *City of New York*, 407 U. S. 203, 205 (1972).

At the other extreme, the Court has applied some standards only to future cases, denying the benefit of the new rule even to the parties before the Court. See, *e. g.*, *Morrissey* v. *Brewer*, 408 U. S. 471, 490 (1972) (establishing basic requirements applicable only to "future revocations of parole"). Cf. *Johnson* v. *New Jersey*, 384 U. S., at 733, citing *England*

v. *Louisiana State Board of Medical Examiners*, 375 U. S. 411 (1964), and *James* v. *United States*, 366 U. S. 213 (1961). As an intermediate position, the Court has applied a change in the law to all future litigants, but retroactively only to the parties at bar. See, *e. g., Stovall* v. *Denno*, 388 U. S., at 301; *DeStefano* v. *Woods*, 392 U. S. 631, 633 (1968); *Adams* v. *Illinois*, 405 U. S. 278, 284–285 (1972) (plurality opinion); *Michigan* v. *Payne*, 412 U. S. 47 (1973).

In a consistent stream of separate opinions since *Linkletter*, Members of this Court have argued against selective awards of retroactivity. Those opinions uniformly have asserted that, at a minimum, all defendants whose cases were still pending on direct appeal at the time of the law-changing decision should be entitled to invoke the new rule.[9]

---

[9] See, *e. g., Brown* v. *Louisiana*, 447 U. S. 323, 337 (1980) (POWELL, J., with whom STEVENS, J., joined, concurring in judgment); *Harlin* v. *Missouri*, 439 U. S. 459, 460 (1979) (POWELL, J., concurring in judgments); *Hankerson* v. *North Carolina*, 432 U. S. 233, 245 (1977) (MARSHALL, J., concurring in judgment); *id.*, at 246 (POWELL, J., concurring in judgment); *United States* v. *Peltier*, 422 U. S. 531, 543 (1975) (Douglas, J., dissenting); *Daniel* v. *Louisiana*, 420 U. S. 31, 33, and n. (1975) (Douglas, J., dissenting); *Michigan* v. *Tucker*, 417 U. S. 433, 461 (1974) (Douglas, J., dissenting); *Michigan* v. *Payne*, 412 U. S. 47, 58 (1973) (Douglas, J., dissenting); *id.*, at 59 (MARSHALL, J., dissenting); *Adams* v. *Illinois*, 405 U. S. 278, 286 (1972) (Douglas, J., with whom MARSHALL, J., concurred, dissenting); *Mackey* v. *United States*, 401 U. S. 667, 675 (1971) (separate opinion of Harlan, J.); *id.*, at 713 (Douglas, J., with whom Black, J., concurred, dissenting); *Williams* v. *United States*, 401 U. S. 646, 665 (1971) (MARSHALL, J., concurring in part and dissenting in part); *Coleman* v. *Alabama*, 399 U. S. 1, 19 (1970) (Harlan, J., concurring in part and dissenting in part); *Von Cleef* v. *New Jersey*, 395 U. S. 814, 817 (1969) (Harlan, J., concurring in result); *Jenkins* v. *Delaware*, 395 U. S. 213, 222 (1969) (Harlan, J., dissenting); *Desist* v. *United States*, 394 U. S. 244, 255 (1969) (Douglas, J., dissenting); *id.*, at 256 (Harlan, J., dissenting); *id.*, at 269 (Fortas, J., dissenting); *Fuller* v. *Alaska*, 393 U. S. 80, 82 (1968) (Douglas, J., dissenting); *DeStefano* v. *Woods*, 392 U. S. 631, 635 (1968) (Douglas, J., with whom Black, J., joined, dissenting); *Stovall* v. *Denno*, 388 U. S. 293, 302 (1967) (Douglas, J., dissenting); *id.*, at 303 (Black, J., dissenting); *Johnson*

In *Desist* v. *United States,* 394 U. S. 244, 256 (1969) (dissenting opinion), and *Mackey* v. *United States,* 401 U. S., at 675 (separate opinion), Justice Harlan presented a comprehensive analysis in support of that principle. In his view, failure to apply a newly declared constitutional rule at least to cases pending on direct review at the time of the decision violated three norms of constitutional adjudication.

First, Justice Harlan argued, the Court's "ambulatory retroactivity doctrine," *id.,* at 681, conflicts with the norm of principled decisionmaking. "Some members of the Court, and I have come to regret that I was among them, initially grasped this doctrine as a way of limiting the reach of decisions that seemed to them fundamentally unsound. Others rationalized this resort to prospectivity as a 'technique' that provided an 'impetus . . . for the implementation of long overdue reforms, which otherwise could not be practicably effected.'" *Id.,* at 676, citing *Jenkins* v. *Delaware,* 395 U. S. 213, 218 (1969). "The upshot of this confluence of viewpoints," 401 U. S., at 676, was that the coalitions favoring nonretroactivity had realigned from case to case, inevitably generating a welter of "incompatible rules and inconsistent principles," *Desist* v. *United States,* 394 U. S., at 258. See also *Michigan* v. *Payne,* 412 U. S., at 61 (MARSHALL, J., dissenting) ("principled adjudication requires the Court to abandon the charade of carefully balancing countervailing considerations when deciding the question of retroactivity").

Second, Justice Harlan found it difficult to accept the notion that the Court, as a judicial body, could apply a "'new' constitutional rule entirely prospectively, while making an exception only for the particular litigant whose case was chosen as the vehicle for establishing that rule." *Desist* v.

v. *New Jersey,* 384 U. S. 719, 736 (1966) (Black, J., with whom Douglas, J., joined, dissenting); *Whisman* v. *Georgia,* 384 U. S. 895 (1966) (Douglas, J., dissenting); *Tehan* v. *United States ex rel. Shott,* 382 U. S., at 419 (Black, J., with whom Douglas, J., joined, dissenting); *Linkletter* v. *Walker,* 381 U. S., at 640 (Black, J., with whom Douglas, J., joined, dissenting).

*United States*, 394 U. S., at 258 (dissenting opinion). A legislature makes its new rules "wholly or partially retroactive or only prospective as it deems wise." *Mackey* v. *United States*, 401 U. S., at 677 (Harlan, J., dissenting). This Court, however,

> "announce[s] new constitutional rules . . . only as a correlative of our dual duty to decide those cases over which we have jurisdiction and to apply the Federal Constitution as one source of the matrix of governing legal rules. . . . Simply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule constitute an indefensible departure from this model of judicial review." *Id.*, at 678–679.

Third, Justice Harlan asserted that the Court's selective application of new constitutional rules departed from the principle of treating similarly situated defendants similarly:[10]

> "[W]hen another similarly situated defendant comes before us, we must grant the same relief or give a principled reason for acting differently. We depart from this basic judicial tradition when we simply pick and choose from among similarly situated defendants those who

---

[10] Evenhanded justice for similarly situated litigants was the principal theme sounded by the dissenting opinions of Justices Black and Douglas. See cases cited in n. 9, *supra*. The views of these Justices diverged from those of Justice Harlan, however, on the question whether equal treatment also requires retroactive application of newly announced constitutional rules to all cases arising on collateral attack. Compare *Desist* v. *United States*, 394 U. S., at 255 (Douglas, J., dissenting), with *id.*, at 260–269 (Harlan, J., dissenting). See also *Adams* v. *Illinois*, 405 U. S., at 287, and n. 4 (Douglas, J., dissenting). Members of the Court continue to offer views on this troublesome question. Compare *Hankerson* v. *North Carolina*, 432 U. S., at 246, and n. (MARSHALL, J., concurring in judgment), with *id.*, at 248 (POWELL, J., concurring in judgment).

alone will receive the benefit of a 'new' rule of constitutional law." *Desist* v. *United States*, 394 U. S., at 258–259 (dissenting opinion).

Justice Harlan suggested one simple rule to satisfy all three of his concerns. "I have concluded that *Linkletter* was right in insisting that all 'new' rules of constitutional law must, at a minimum, be applied to all those cases which are still subject to direct review by this Court at the time the 'new' decision is handed down." *Id.*, at 258. "[A] proper perception of our duties as a court of law, charged with applying the Constitution to resolve every legal dispute within our jurisdiction on direct review, mandates that we apply the law as it is at the time, not as it once was." *Mackey* v. *United States*, 401 U. S., at 681 (separate opinion).

We now agree with Justice Harlan that "'[r]etroactivity' must be rethought," *Desist* v. *United States*, 394 U. S., at 258 (dissenting opinion). We therefore examine the circumstances of this case to determine whether it presents a retroactivity question clearly controlled by past precedents, and if not, whether application of the Harlan approach would resolve the retroactivity issue presented in a principled and equitable manner.

### III

### A

At the outset, we must first ask whether respondent's case presents a retrospectivity problem clearly controlled by existing precedent. Re-examination of the post-*Linkletter* decisions convinces us that in three narrow categories of cases, the answer to the retroactivity question has been effectively determined, not by application of the *Stovall* factors, but rather, through application of a threshold test.[11]

---

[11] These cases therefore have not proved "readily susceptible of analysis under the *Linkletter* line of cases." *Robinson* v. *Neil*, 409 U. S. 505, 508 (1973). The dissent's accusation that these categories exclude the "most obvious" line of cases—those announcing rules relating to the truth-finding

First, when a decision of this Court merely has applied settled precedents to new and different factual situations, no real question has arisen as to whether the later decision should apply retrospectively. In such cases, it has been a foregone conclusion that the rule of the later case applies in earlier cases, because the later decision has not in fact altered that rule in any material way. See, *e. g.*, *Dunaway* v. *New York*, 442 U. S. 200, 206 (1979) (reviewing application of the rule in *Brown* v. *Illinois*, 422 U. S. 590 (1975)); *Spinelli* v. *United States*, 393 U. S. 410, 412 (1969) ("further explicat-[ing]" the principles of *Aguilar* v. *Texas*, 378 U. S. 108 (1964)); *Desist* v. *United States*, 394 U. S., at 263 (Harlan, J., dissenting).

Conversely, where the Court has expressly declared a rule of criminal procedure to be "a clear break with the past," *Desist* v. *United States*, 394 U. S., at 248, it almost invariably has gone on to find such a newly minted principle nonretroactive. See *United States* v. *Peltier*, 422 U. S. 531, 547, n. 5 (1975) (BRENNAN, J., dissenting) (collecting cases). In this second type of case, the traits of the particular constitutional rule have been less critical than the Court's express threshold determination that the "'new' constitutional interpretatio[n] . . . so change[s] the law that prospectivity is arguably the proper course," *Williams* v. *United States*, 401 U. S., at 659 (plurality opinion). Once the Court has found that the new rule was unanticipated, the second and third *Stovall* factors—reliance by law enforcement authorities on the old standards and effect on the administration of justice of a retroactive application of the new rule—have virtually

---

function, *post*, at 567—misses our point. In those cases, the retroactivity decision *has* in fact turned on a traditional application of the *Stovall* factors, with the central issue in dispute often being the major purpose to be served by the new standard. Compare *Brown* v. *Louisiana*, 447 U. S. 323 (1980) (plurality opinion), with *id.*, at 337 (REHNQUIST, J., dissenting) (disagreeing over the "major purpose" of the unanimous six-person jury rule of *Burch* v. *Louisiana*, 441 U. S. 130 (1979)).

compelled a finding of nonretroactivity. See, *e. g.*, *Gosa* v. *Mayden*, 413 U. S., at 672–673, 682–685 (plurality opinion); *Michigan* v. *Payne*, 412 U. S., at 55–57.[12]

Third, the Court has recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place. The Court has invalidated inconsistent prior judgments where its reading of a particular constitutional guarantee immunizes a defendant's conduct from punishment, see, *e. g.*, *United States* v. *United States Coin & Currency*, 401 U. S. 715, 724 (1971) (penalty against assertion of Fifth Amendment privilege against self-incrimination), or serves "to prevent [his] trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of [that] trial," *Robinson* v. *Neil*, 409 U. S., at 509 (double jeopardy). In such cases, the Court has relied less on the technique of retroactive application than on the notion that the prior inconsistent judgments or sentences were void *ab initio*. See, *e. g.*, *Moore* v. *Illinois*, 408 U. S. 786, 800 (1972) (retroactive application of Eighth Amendment ruling in *Furman* v. *Georgia*, 408 U. S. 238 (1972)); *Ashe* v. *Swenson*, 397 U. S. 436, 437, n. 1 (1970) (retroactive application of double jeopardy ruling in *Benton* v. *Maryland*, 395 U. S. 784 (1969)). See also *Gosa* v. *Mayden*, 413 U. S., at 693 (MARSHALL, J., dissenting); *Michigan* v. *Payne*, 412 U. S., at 61 (MARSHALL, J., dissenting) (rulings are fully retroactive when the "Court

---

[12] In the civil context, in contrast, the "clear break" principle has usually been stated as the threshold test for determining whether or not a decision should be applied nonretroactively. See, *e. g.*, *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 106 (1971). Once it has been determined that a decision has "establish[ed] a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed," the Court has gone on to examine the history, purpose, and effect of the new rule, as well as the inequity that would be imposed by its retroactive application. *Id.*, at 106–107. See also *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481, 499 (1968).

has held that the trial court lacked jurisdiction in the traditional sense").

Respondent's case neatly fits none of these three categories. First, *Payton* v. *New York* did not simply apply settled precedent to a new set of facts. In *Payton*, the Court acknowledged that the "important constitutional question presented" there had been "expressly left open in a number of our prior opinions." 445 U. S., at 574 and 575, n. 1, citing *United States* v. *Watson*, 423 U. S. 411, 418, n. 6 (1976); *Gerstein* v. *Pugh*, 420 U. S. 103, 113, n. 13 (1975); *Coolidge* v. *New Hampshire*, 403 U. S. 443, 474–481 (1971); and *Jones* v. *United States*, 357 U. S. 493, 499–500 (1958).

By the same token, however, *Payton* also did not announce an entirely new and unanticipated principle of law. In general, the Court has not subsequently read a decision to work a "sharp break in the web of the law," *Milton* v. *Wainwright*, 407 U. S. 371, 381, n. 2 (1972) (Stewart, J., dissenting), unless that ruling caused "such an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older one," *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481, 498 (1968). Such a break has been recognized only when a decision explicitly overrules a past precedent of this Court, see, *e. g.*, *Desist* v. *United States*, 394 U. S. 244 (1969); *Williams* v. *United States*, 401 U. S. 646 (1971), or disapproves a practice this Court arguably has sanctioned in prior cases, see, *e. g.*, *Gosa* v. *Mayden*, 413 U. S., at 673 (plurality opinion); *Adams* v. *Illinois*, 405 U. S., at 283; *Johnson* v. *New Jersey*, 384 U. S., at 731, or overturns a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved. See, *e. g.*, *Gosa* v. *Mayden*, 413 U. S., at 673 (plurality opinion) (applying nonretroactively a decision that "effected a decisional change in attitude that had prevailed for many decades"); *Stovall* v. *Denno*, 388 U. S., at 299–300. See also *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 107 (1971); *Cipriano*

v. *City of Houma*, 395 U. S. 701 (1969); *Milton* v. *Wainwright*, 407 U. S., at 381–382, n. 2 (Stewart, J., dissenting) ("sharp break" occurs when "decision overrules clear past precedent . . . or disrupts a practice long accepted and widely relied upon").

*Payton* did none of these. *Payton* expressly overruled no clear past precedent of this Court on which litigants may have relied. Nor did *Payton* disapprove an established practice that the Court had previously sanctioned. To the extent that the Court earlier had spoken to the conduct engaged in by the police officers in *Payton*, it had deemed it of doubtful constitutionality.[13] The Court's own analysis in *Payton* makes it clear that its ruling rested on both long-recognized principles of Fourth Amendment law and the weight of historical authority as it had appeared to the Framers of the Fourth Amendment.[14] Finally, *Payton* overturned no long-

---

[13] At least since *Boyd* v. *United States*, 116 U. S. 616, 630 (1886), the Court had acknowledged that the Fourth Amendment accords special protection to the home. *McDonald* v. *United States*, 335 U. S. 451, 456 (1948), stated that "the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home." See also *Johnson* v. *United States*, 333 U. S. 10, 13–15 (1948). While ultimately declining to decide whether a warrant is necessary to effect a home arrest, *Coolidge* v. *New Hampshire*, 403 U. S. 443, 474–475 (1971) (footnote omitted), had declared that "a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" See also *United States* v. *United States District Court*, 407 U. S. 297, 313 (1972) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"); *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 561 (1976) ("the sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection").

[14] The *Payton* Court relied on the "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." 445 U. S., at 586, citing *Coolidge* v. *New Hampshire*, 403 U. S., at 477. The Court further recognized that the ex-

standing practice approved by a near-unanimous body of lower court authority.[15]   *Payton* therefore does not fall into that narrow class of decisions whose nonretroactivity is effec-

---

press language of the Fourth Amendment "has drawn a firm line at the entrance to the house" in "terms that apply equally to seizures of property and to seizures of persons."   445 U. S., at 590.   After examining the common-law understanding of an officer's authority to arrest a suspect in his own home, *id.*, at 591–598, the Court concluded that "the weight of authority as it appeared to the Framers [of the Fourth Amendment] was to the effect that a warrant was required [before a home arrest], or at the minimum that there were substantial risks in proceeding without one."   *Id.*, at 596.

[15] While the practice invalidated in *Payton* had found support in some state courts, those decisions evinced "by no means the kind of virtual unanimity," *id.*, at 600, required to make *Payton* a clear break with the past. In *Payton*, the Court noted that at the time of its decision, " '[o]nly 24 of the 50 States currently sanction warrantless entries into the home to arrest, . . . and there is an obvious declining trend."   *Ibid.*   In California, where the present respondent's case arose, the State Supreme Court had held more than a year before respondent's arrest that, under the Fourth Amendment and its state constitutional counterpart, warrantless arrests within the home were *per se* unreasonable in the absence of exigent circumstances.   See *People* v. *Ramey*, 16 Cal. 3d 263, 275–276, 545 P. 2d 1333, 1340–1341, cert. denied, 429 U. S. 929 (1976).

Of the seven United States Courts of Appeals that had considered the question before *Payton*, five had expressed the view that warrantless home arrests were unconstitutional.   445 U. S., at 575, and n. 4.   Three other Circuits had assumed, without expressly deciding, that such searches were unlawful.   *Ibid.*   After one of those decisions, in 1978, the Department of Justice instructed federal law enforcement agencies to follow the practice of procuring arrest warrants before entering a suspect's home to arrest him without exigent circumstances.   Brief for United States 33, n. 20.

In the Ninth Circuit, where respondent was arrested, it has been said that "law enforcement officials knew that th[e] circuit's law was unsettled but that there was some drift toward a warrant requirement."   *United States* v. *Blake*, 632 F. 2d, at 736.   *United States* v. *Phillips*, 497 F. 2d 1131, 1135 (CA9 1974), had suggested in dictum that warrants are required before officers may enter a private dwelling to effect an arrest.   In *United States* v. *Calhoun*, 542 F. 2d 1094, 1102 (CA9 1976), cert. denied *sub nom. Stephenson* v. *United States*, 429 U. S. 1064 (1977), it was observed that

tively preordained because they unmistakably signal "a clear break with the past," *Desist* v. *United States*, 394 U. S., at 248.

It is equally plain that *Payton* does not fall into the third category of cases that do not pose difficult retroactivity questions. *Payton* did not hold that the trial court lacked authority to convict or sentence Theodore Payton, nor did *Payton*'s reading of the Fourth Amendment immunize Payton's conduct from punishment. The holding in *Payton* did not prevent the defendant's trial from taking place; rather, it reversed the New York Court of Appeals' judgment and remanded for a new trial to be conducted without unconstitutionally obtained evidence.

### B

Having determined that the retroactivity question here is not clearly controlled by our prior precedents, we next must ask whether that question would be fairly resolved by applying the rule in *Payton* to all cases still pending on direct appeal at the time when *Payton* was decided. Answering that question affirmatively would satisfy each of the three concerns stated in Justice Harlan's opinions in *Desist* and *Mackey*.

First, retroactive application of *Payton* to all previously nonfinal convictions would provide a principle of decisionmaking consonant with our original understanding of retroactivity in *Linkletter* and *Shott*. Moreover, such a principle would be one capable of general applicability, satisfying Justice Harlan's central concern: "Refusal to apply new constitutional rules to all cases arising on direct review . . . tends to cut this Court loose from the force of precedent, allowing us

---

the Government had agreed that, absent exigent circumstances, a warrantless and nonconsensual entry into a suspect's home would be illegal. *United States* v. *Prescott*, 581 F. 2d, at 1350, then squarely held such arrests unconstitutional. See n. 5, *supra*.

to restructure artificially those expectations legitimately created by extant law and thereby mitigate the practical force of *stare decisis* . . . a force which ought properly to bear on the judicial resolution of any legal problem." *Mackey* v. *United States*, 401 U. S., at 680–681 (separate opinion).

Second, application of *Payton* to cases pending on direct review would comport with our judicial responsibilities "to do justice to each litigant on the merits of his own case," *Desist* v. *United States*, 394 U. S., at 259 (Harlan, J., dissenting), and to "resolve all cases before us on direct review in light of our best understanding of governing constitutional principles." *Mackey* v. *United States*, 401 U. S., at 679 (separate opinion of Harlan, J.). The Court of Appeals held that the circumstances of respondent's arrest violated *Payton*, and the Government does not dispute that contention. See n. 6, *supra*. It would be ironic indeed were we now to reverse a judgment applying *Payton*'s rule, when in *Payton* itself, we reversed a directly contrary judgment of the New York Court of Appeals. As Justice Harlan noted in *Desist:* "If a 'new' constitutional doctrine is truly right, we should not reverse lower courts which have accepted it; nor should we affirm those which have rejected the very arguments we have embraced." 394 U. S., at 259.

Third, application of the Harlan approach to respondent's case would further the goal of treating similarly situated defendants similarly. The Government contends that respondent may not invoke *Payton* because he was arrested before *Payton* was decided. Yet it goes without saying that Theodore Payton also was arrested before *Payton* was decided, and he received the benefit of the rule in his case. Furthermore, at least one other defendant whose conviction was not final when *Payton* issued benefited from *Payton*'s rule, although he, too, was arrested before *Payton* was decided.[16]

---

[16] The New York Court of Appeals affirmed Payton's conviction along with that of Obie Riddick. See *Payton* v. *New York*, 445 U. S., at

An approach that resolved all nonfinal convictions under the same rule of law would lessen the possibility that this Court might mete out different constitutional protection to defendants simultaneously subjected to identical police conduct.[17]

578–579. This Court noted probable jurisdiction in Riddick's appeal, consolidated it with Payton's, then reversed both convictions. *Id.*, at 603.

In theory, the Court could have held Riddick's jurisdictional statement pending the disposition in Payton's case, then vacated and remanded the case for reconsideration in light of *Payton.* Such a course was taken in seven other nonfinal cases. See *Gonzalez* v. *New York,* 446 U. S. 902 (1980); *Brown* v. *Florida,* 446 U. S. 902 (1980); *Busch* v. *Florida,* 446 U. S. 902 (1980); *Vidal* v. *New York,* 446 U. S. 903 (1980); *Gordon* v. *New York,* 446 U. S. 903 (1980); *Gayle* v. *New York,* 446 U. S. 905 (1980); and *Dunagan* v. *Illinois,* 446 U. S. 905 (1980). Alternatively, the Court could have given all these cases plenary review.

Potential for unequal treatment is inherent in this process. As Justice Douglas "recalled," when the Court decided *Miranda* v. *Arizona,* 384 U. S. 436 (1966):

"[S]ome 80 cases were presented raising the same question. We took four of them and held the rest and then disposed of each of the four, applying the new procedural rule retroactively. But as respects the rest of the pending cases we denied any relief. . . . Yet it was sheer coincidence that those precise four were chosen. Any other single case in the group or any other four would have been sufficient for our purposes." *Desist* v. *United States,* 394 U. S., at 255 (dissenting opinion).

The dissent argues that "we long ago resolved the problem of the appearance of inequity that arises whenever we limit the retroactive reach of a new principle of law." *Post,* at 566. But the dissent mischaracterizes both the problem and this Court's treatment of it. The problem is not merely the *appearance* of inequity, but the *actual inequity* that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary of a retroactively applied rule. As the persistently voiced dissatisfaction with the Court's "ambulatory retroactivity doctrine" has revealed, see n. 9, *supra,* until now this Court has not "resolved" this problem so much as it has chosen to tolerate it. The time for toleration has come to an end.

[17] We are aware, of course, that many considerations affect a defendant's progress through the judicial system, and that the speed of appellate review will differ from State to State, Circuit to Circuit, and case to case. Even under our approach, it may be unavoidable that some similarly

## IV

Against adoption of this approach, the Government raises four arguments based on *United States* v. *Peltier*, 422 U. S. 531 (1975). None is persuasive.

The Government first cites *Peltier*'s holding: that the Fourth Amendment rule announced in *Almeida-Sanchez* v. *United States*, 413 U. S. 266 (1973), should not apply retroactively to a case pending on appeal when *Almeida-Sanchez* was announced. By so holding, the Government suggests,

---

situated defendants will be treated differently. Cf. *Williams* v. *United States*, 401 U. S., at 657, and n. 9 (plurality opinion).

The Government suggests an approach, however, that virtually ensures that such anomalies will occur. The Government concedes that the *Payton* rule should apply to any pre-*Payton* case arising in a Circuit where the United States Court of Appeals already had held authoritatively that *Payton*-type searches were unlawful. Brief for United States 22–26. When respondent was arrested, two Courts of Appeals had invalidated warrantless home arrests conducted in the absence of exigent circumstances. See *Dorman* v. *United States*, 140 U. S. App. D. C. 313, 435 F. 2d 385 (1970); *United States* v. *Shye*, 492 F. 2d 886 (CA6 1974). Thus, under the Government's theory, the statements of a suspect arrested in the District of Columbia, on the same day as respondent was arrested in Los Angeles and under identical circumstances, should be excluded while respondent's statements should not. Moreover, under the Government's reasoning, this Court would be obliged to reverse a ruling of the Court of Appeals for the Ninth Circuit excluding those statements, but not an identical ruling from the District of Columbia Circuit in a parallel case.

The dissent takes a different tack. Arguing that "inherent arbitrariness" arises whenever lines are drawn in this area, the dissent suggests that the "best way to deal with this problem" is to continue to make retroactivity decisions by picking and choosing from among similarly situated defendants. See *post*, at 568. By clinging to this view, the dissent, and not the Court, "is fooling itself." *Ibid.* This Court has no power to speed up or slow down the appellate process in the many tribunals throughout the country to ensure similar treatment of similarly situated defendants. The Court does, however, have the power to eliminate the obvious unfairness that results when it gives only the most conveniently situated defendant the retrospective benefit of a newly declared rule. ·

*Peltier* declared a principle that controls the issue of retroactivity for all Fourth Amendment rulings.[18]

Upon examination, however, the retroactivity question posed here differs from that presented in *Peltier.* As the Government concedes, *Payton* overturned neither a statute nor any consistent judicial history approving nonconsensual, warrantless home entries. See Brief for United States 30, n. 18. Thus, its nonretroactivity is not preordained under the "clear break" principles stated above. In *Peltier,* in contrast, the Court noted that *Almeida-Sanchez* had invalidated a form of search previously sanctioned by "a validly enacted statute, supported by longstanding administrative regulations and continuous judicial approval." 422 U. S., at 541. See also *Almeida-Sanchez* v. *United States,* 413 U. S., at 278 (POWELL, J., concurring) ("While the question is one of first impression in this Court," the practice disapproved had "been consistently approved by the judiciary"); *id.,* at 298–299, n. 10 (WHITE, J., dissenting) (35 of 36 judges in 20 Court of Appeals cases had approved the invalidated practice).

Because *Almeida-Sanchez* had overturned a longstanding practice to which this Court had not spoken, but which a near-unanimous body of lower court authority had approved, it represented a "clear break" with the past. For that reason alone, under controlling retroactivity precedents, the nonretroactive application of *Almeida-Sanchez* would have been appropriate even if the case had involved no Fourth Amendment question. In that respect, *Peltier* resembles several earlier decisions that held "new" Fourth Amendment

---

[18] The dissent shares this mistaken impression. In support of its claim, the dissent cites *Peltier*'s suggestion that every decision by this Court involving the exclusionary rule has been "accorded only prospective application." *Post,* at 564, citing 422 U. S., at 535. As *Peltier* recognized with discomfort, however, *Linkletter* itself—the first of the modern retroactivity cases—acknowledged the application of the *Mapp* exclusionary rule to cases that were pending on direct review at the time that *Mapp* was decided. See 422 U. S., at 535, n. 5.

doctrine nonretroactive, not on the ground that all Fourth Amendment rulings apply only prospectively, but because the particular decisions being applied "so change[d] the law that prospectivity [was] arguably the proper course." *Williams* v. *United States*, 401 U. S., at 659 (plurality opinion) (refusing to apply retroactively *Chimel* v. *California*, 395 U. S. 752 (1969), which overruled *United States* v. *Rabinowitz*, 339 U. S. 56 (1950), and *Harris* v. *United States*, 331 U. S. 145 (1947)). See also *Desist* v. *United States*, 394 U. S. 244 (1969) (refusing to apply retroactively *Katz* v. *United States*, 389 U. S. 347 (1967), which overruled *Goldman* v. *United States*, 316 U. S. 129 (1942), and *Olmstead* v. *United States*, 277 U. S. 438 (1928)).

The Government bases its second argument on *Peltier's* broad language: "If the purpose of the exclusionary rule is to deter unlawful police conduct then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had *knowledge, or may properly be charged with knowledge,* that the search was unconstitutional under the Fourth Amendment" (emphasis added). 422 U. S., at 542. The Government reads this language to require that new Fourth Amendment rules must be denied retroactive effect in all cases except those in which law enforcement officers failed to act in good-faith compliance with then-prevailing constitutional norms.

The Government does not seriously suggest that the retroactivity of a given Fourth Amendment ruling should turn solely on the subjective state of a particular arresting officer's mind. Instead, it offers an "objective" test: that law enforcement officers "may properly be charged with knowledge" of all "settled" Fourth Amendment law. Under the Government's theory, because the state of Fourth Amendment law regarding warrantless home arrests was "unsettled" before *Payton*, that ruling should not apply retroactively even to cases pending on direct appeal when *Payton* was decided. See Brief for United States 14–19, 34–38.

Yet the Government's reading of *Peltier* would reduce its own "retroactivity test" to an absurdity. Under this view, the only Fourth Amendment rulings worthy of retroactive application are those in which the arresting officers violated pre-existing guidelines clearly established by prior cases. But as we have seen above, cases involving simple application of clear, pre-existing Fourth Amendment guidelines raise no real questions of retroactivity at all. Literally read, the Government's theory would automatically eliminate *all* Fourth Amendment rulings from consideration for retroactive application.

The Government's third claim is that *Peltier*'s logic suggests that retroactive application of Fourth Amendment decisions like *Payton*—even to cases pending on direct review— would not serve the policies underlying the exclusionary rule. Cf. 422 U. S., at 536–542. Yet viewed in the light of *Peltier*'s holding, this assertion also fails. *Peltier* suggested only that retroactive application of a Fourth Amendment ruling that worked a "sharp break" in the law, like *Almeida-Sanchez*, would have little deterrent effect, because law enforcement officers would rarely be deterred from engaging in a practice they never expected to be invalidated. See 422 U. S., at 541–542.

This logic does not apply to a ruling like *Payton*, that resolved a previously unsettled point of Fourth Amendment law. Because this Court cannot rule on every unsettled Fourth Amendment question, years may pass before the Court finally invalidates a police practice of dubious constitutionality. See, *e. g., Desist* v. *United States*, 394 U. S., at 275 (Fortas, J., dissenting) (arguing that the "physical-trespass" wiretap rule of *Olmstead* v. *United States*, 277 U. S. 438 (1928), had been moribund for 17 years before it was formally overruled). Long before *Payton*, for example, this Court had questioned the constitutionality of warrantless home arrests. See n. 13, *supra*. Furthermore, the Court's

opinions consistently had emphasized that, in light of the constitutional protection traditionally accorded to the privacy of the home, police officers should resolve any doubts regarding the validity of a home arrest in favor of obtaining a warrant. See, *e. g., Johnson* v. *United States*, 333 U. S. 10, 14 (1948) ("Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers").

If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior.[19] Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord *any* retroactive effect to Fourth Amendment rulings would "encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach." *Desist* v. *United States*, 394 U. S., at 277 (Fortas, J., dissenting).

The Government finally argues that retroactive application of *Payton*, even to a case pending on direct appeal, would accomplish nothing but the discharge of a wrongdoer. Justice Harlan gave the answer to this assertion. "We do not release a criminal from jail because we like to do so, or because we think it wise to do so, but only because the government has offended constitutional principle in the conduct of his case. And when another similarly situated defendant comes

---

[19] The record in this case, for example, does not explain why respondent's arresting officers failed to obtain a warrant for his arrest, when they did obtain a warrant to arrest his codefendant. See n. 2, *supra.*

before us, we must grant the same relief or give a principled reason for acting differently." *Desist* v. *United States*, 394 U. S., at 258 (dissenting opinion). Applying *Payton* to convictions that were not yet final when *Payton* issued would accomplish the first step toward "turning our backs on the *ad hoc* approach that has so far characterized our decisions in the retroactivity field and proceeding to administer the doctrine on principle." *Jenkins* v. *Delaware*, 395 U. S., at 224 (Harlan, J., dissenting).

## V

To the extent necessary to decide today's case, we embrace Justice Harlan's views in *Desist* and *Mackey*. We therefore hold that, subject to the exceptions stated below, a decision of this Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered.

By so holding, however, we leave undisturbed our precedents in other areas. First, our decision today does not affect those cases that would be clearly controlled by our existing retroactivity precedents. Second, because respondent's case arises on direct review, we need not address the retroactive reach of our Fourth Amendment decisions to those cases that still may raise Fourth Amendment issues on collateral attack.[20] Cf. n. 10, *supra*. Third, we express no view on the retroactive application of decisions construing any constitutional provision other than the Fourth Amendment.[21]

---

[20] After *Stone* v. *Powell*, 428 U. S. 465 (1976), the only cases raising Fourth Amendment challenges on collateral attack are those federal habeas corpus cases in which the State has failed to provide a state prisoner with an opportunity for full and fair litigation of his claim, analogous federal cases under 28 U. S. C. § 2255, and collateral challenges by state prisoners to their state convictions under postconviction relief statutes that continue to recognize Fourth Amendment claims.

[21] The logic of our ruling, however, is not inconsistent with our precedents giving complete retroactive effect to constitutional rules whose purpose is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function. See, *e. g., Hankerson* v. *North Carolina*, 432 U. S. 233 (1977); *Ivan V.* v. *City of New York*, 407 U. S. 203 (1972). De-

Finally, all questions of civil retroactivity continue to be governed by the standard enunciated in *Chevron Oil Co.* v. *Huson*, 404 U. S., at 106–107. See n. 12, *supra*.

Respondent's case was pending on direct appeal when *Payton* v. *New York* was decided. Because the Court of Appeals correctly held that the rule in *Payton* should apply to respondent's case, its judgment is affirmed.[22]

*It is so ordered.*

JUSTICE BRENNAN, concurring.

I join the Court's opinion on my understanding that the decision leaves undisturbed our retroactivity precedents as ap-

_____

pending on the constitutional provision involved, additional factors may warrant giving a particular ruling retroactive effect beyond those cases pending on direct review. See *Hankerson* v. *North Carolina*, 432 U. S., at 248, n. 2 (POWELL, J., concurring in judgment).

Curiously, the dissent faults us not only for limiting our ruling to the only context properly presented by this case—the Fourth Amendment— but also for preserving, rather than overruling, clearly controlling retroactivity precedents. See *post*, at 568. The dissent then recasts those precedents in its own simplistic way, arguing that rules related to truth-finding automatically receive full retroactive effect, while implying that all other rules—including Fourth Amendment rules—should receive none.

There are, however, two problems with this. First, the Court's decisions regularly giving complete retroactive effect to truth-finding rules have in no way required that newly declared Fourth Amendment rulings be denied all retroactive effect. For the reasons already stated, retroactive application of Fourth Amendment rules at least to cases pending on direct review furthers the policies underlying the exclusionary rule. Second, and more important, the Fourth Amendment "rule" urged by the dissent is far from a "perfectly good" one. *Ibid.* As we already have shown, that "rule" condones obviously inequitable treatment of similarly situated litigants and judicial injustice to individual litigants.

[22] The question on which we granted certiorari encompassed one other issue: whether the Court of Appeals correctly concluded that its own decision in *United States* v. *Prescott*, 581 F. 2d 1343 (1978), applies retroactively to respondent's arrest. See n. 5, *supra*. Because we hold that the principles of our decision in *Payton* apply retroactively to respondent's case, we need not disturb the Court of Appeals' ruling regarding the retroactive application of its own prior decision.

plied to convictions final at the time of decision. See, *e. g.*, *Stovall* v. *Denno*, 388 U. S. 293 (1967).

JUSTICE WHITE, with whom THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

In my view, this case is controlled by *United States* v. *Peltier*, 422 U. S. 531 (1975). *Peltier* established two propositions. First, retroactive application of a new constitutional doctrine is appropriate when that doctrine's major purpose is "'to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials.'" *Id.*, at 535, quoting *Williams* v. *United States*, 401 U. S. 646, 653 (1971). Second, new extensions of the exclusionary rule do not serve this purpose and, therefore, will not generally be applied retroactively. There was surely nothing extraordinary about our ruling in *Payton* v. *New York*, 445 U. S. 573 (1980), that would justify an exception to this general rule.

*Peltier* was only the latest of a number of cases involving the question of whether rulings extending the reach of the exclusionary rule should be given retroactive effect. We noted there that "in every case in which the Court has addressed the retroactivity problem in the context of the exclusionary rule . . . the Court has concluded that any such new constitutional principle would be accorded only prospective application." 422 U. S., at 535. We suggested that there were two reasons for this consistent pattern of decisions and that these two reasons were directly related to the justifications for the exclusionary rule.

That rule has traditionally been understood to serve two purposes: first, it preserves "judicial integrity"; second, it acts as a deterrent to unconstitutional police conduct. Neither of these purposes, however, is furthered by retroactive application of new extensions of the rule. First, "if the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the 'impera-

tive of judicial integrity' is not offended by the introduction into evidence of that material." *Id.*, at 537. Second, a deterrence purpose can only be served when the evidence to be suppressed is derived from a search which the law enforcement officers knew or should have known was unconstitutional under the Fourth Amendment. *Id.*, at 542.

In focusing on the purpose of the exclusionary rule in order to decide the question of retroactivity, the Court was following settled principles. In *Linkletter* v. *Walker*, 381 U. S. 618 (1965), which the majority agrees is the first of the modern retroactivity cases, the Court set forth a three-pronged model for analysis of the retroactivity question presented there:

> "[W]e must look to the purpose of the *Mapp* rule; the reliance placed upon the *Wolf* doctrine; and the effect on the administration of justice of a retrospective application of *Mapp.*" *Id.*, at 636.

This three-prong analysis was consistently applied in the cases which followed, *Tehan* v. *United States ex rel. Shott*, 382 U. S. 406, 419 (1966); *Johnson* v. *New Jersey*, 384 U. S. 719, 727 (1966); *Stovall* v. *Denno*, 388 U. S. 293, 297 (1967). Indeed, in *Stovall*, the Court specifically announced that these three considerations—purpose of the new rule, reliance on the old rule, and effect on the administration of justice— were generally to guide resolution of all retroactivity problems relating to constitutional rules of criminal procedure. In each of these cases, the purpose of the new rule was the first consideration. That this was not accidental was made absolutely clear in *Desist* v. *United States*, 394 U. S. 244, 249 (1969): "Foremost among these factors is the purpose to be served by the new constitutional rule."* And as we went on

---

*See also 394 U. S., at 251: "It is to be noted also that we have relied heavily on the factors of the extent of reliance and consequent burden on the administration of justice only when the purpose of the rule in question did not clearly favor either retroactivity or prospectivity."

to say there, "[t]his criterion strongly supports prospectivity for a decision amplifying the evidentiary exclusionary rule." *Ibid.*

Moreover, up until today's decision it was clear that these same principles governed the question of whether a new decision should retroactively apply to cases pending on appeal at the time of its announcement. *Peltier* itself was just this sort of a case: Peltier's case was on appeal at the time of the announcement of the decision in *Almeida-Sanchez* v. *United States*, 413 U. S. 266 (1973). Indeed, we reversed the Court of Appeals' holding in that case that the "rule announced . . . in Almeida-Sanchez v. United States . . . should be applied to similar cases pending on appeal on the date the Supreme Court's decision was announced." *United States* v. *Peltier*, 500 F. 2d 985, 986 (CA9 1974) (footnote omitted). I had thought that we long ago resolved the problem of the appearance of inequity that arises whenever we limit the retroactive reach of a new principle of law. As JUSTICE BRENNAN stated for the Court in *Stovall, supra,* at 301:

> "Inequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue. But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision-making."

All of these principles are well settled and require reversal of the judgment of the Court of Appeals. The majority, in an intricate and confusing opinion disagrees. Two reasons for its disagreement seem to be presented.

First, the majority discerns no consistent reading of our precedents that would control this case. *Ante,* at 554 ("Having determined that the retroactivity question here is not clearly controlled by our prior precedents . . ."). Given the clarity with which we have previously set out the applicable

principles and the consistent application of those principles
in cases involving extensions of the exclusionary rule, this
is surely a strange conclusion. Eschewing the straight-
forward reading of the cases set forth above, which looks pri-
marily to the substantive purpose of the relevant rule of law,
the majority replaces it with an exceedingly formal set of
three categories. *Ante*, at 549–551. Because these catego-
ries turn out to be dicta only, they merit little comment.
Suffice it to say that their inadequacy is obvious from even a
moment's reflection: That category to which the majority
agrees "the Court has regularly given complete retroactive
effect" is nowhere included in this formal scheme—cases an-
nouncing new constitutional rules whose major purpose "'is
to overcome an aspect of the criminal trial that substantially
impairs its truth-finding function and so raises serious ques-
tions about the accuracy of guilty verdicts in past trials.'"
*Ante*, at 544, quoting *Williams* v. *United States*, 401 U. S.,
at 653 (plurality opinion). It is little wonder that the major-
ity finds this case difficult, when it has failed to learn the
most obvious lessons of the previous cases.

Second, the majority seems to think that the problems of
principle that Justice Harlan struggled with in his dissent in
*Desist* v. *United States, supra,* are unanswerable under any
rule that fails to give the benefits of a new constitutional rul-
ing to all criminal defendants whose cases are pending on ap-
peal at the time of the announcement. These problems are
not new and were, I believe, adequately answered by JUS-
TICE BRENNAN in *Stovall.* The majority's approach, how-
ever, does not resolve these theoretical problems; it simply
draws what is necessarily an arbitrary line in a somewhat dif-
ferent place than the Court had previously settled upon.
Anything less than full retroactivity will necessarily appear
unjust in some instances; it will provide different treatment
to similarly situated individuals. The majority recognizes
that the vagaries of the appellate process will cause this same
problem to reappear under its proposed rule: "Even under

our approach, it may be unavoidable that some similarly situated defendants will be treated differently." *Ante*, at 556–557, n. 17. We had previously held that the best way to deal with this problem of inherent arbitrariness was to abide by the substantive principles outlined in *Stovall*. The majority makes no better suggestion today and is fooling itself if it believes that its proposal is a reasoned response to this problem of arbitrariness, rather than an exercise in line-drawing.

The insubstantiality of the majority's analysis and proposal is well illustrated by its conclusion. Despite the appearance of having resolved the difficult problem of the apparent injustice of any rule of partial retroactivity, the Court announces at the end that its decision today applies only to decisions "construing the Fourth Amendment" and asserts that it is not disturbing any of our retroactivity precedents. *Ante*, at 562. That is, it returns from its abstract procedural approach to the substantive rule of law at issue. There are two problems with this, however. First, there is no connection between the analysis and the conclusion. Second, and more important, we already had a perfectly good rule for resolving retroactivity problems involving the Fourth Amendment.

Accordingly, I dissent.