UNITED STATES

v.

**Airman First Class Keith J. PETTERSEN, FR 145–54–9818 United States Air Force.**

**ACM S25582.**

U. S. Air Force Court of Military Review.

18 Aug. 1982.

Appellate Counsel for the Accused: Colonel George R. Stevens and Captain Richard A. Morgan.

Appellate Counsel for the United States: Colonel James P. Porter, Colonel Kenneth R. Rengert and Major Michael J. Hoover.

Before HODGSON, POWELL, and MILLER, Appellate Military Judges.

## DECISION

MILLER, Judge:

Before a special court-martial, military judge alone, the accused was convicted pursuant to his pleas of a four-day absence without leave (AWOL), failure to obey a lawful general regulation,[1] and willful disobedience of a lawful order of his superior non-commissioned officer to return to duty. These offenses were charged as violations of Articles 86, 92, and 91, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 892, 891, respectively.[2]

The approved sentence consists of a bad-conduct discharge, four months' confinement at hard labor, forfeiture of $367.00 per month for four months, and reduction to airman basic.

In addition to applying the holding of *United States v. Lynch,* 13 M.J. 394 (C.M.A.

1982), to cases properly before this court, we determine that some degree of submission to an order is required before it can constitute exercise of military control so as to terminate that servicemember's absence. Finally, we determine that the failure of an absentee to submit to a lawful verbal order to terminate his absence, issued by a superior who lacks authority to apprehend, is an offense separately chargeable and punishable from the AWOL offense itself.

The accused, while assigned to McConnell Air Force Base, Kansas, absented himself from duty on 21 January 1982. On 22 January, when the accused had been absent from duty in excess of 24 hours, his first sergeant, MSgt. S., accompanied by the accused's duty supervisor, TSgt. P., went to the accused's off-base residence. The first sergeant knocked on the accused's door, and the accused, shirtless and dressed only in jeans, answered. The first sergeant immediately asked the accused if he was ready to return to duty. The accused responded, "No." The first sergeant then asked the accused if he would allow the two of them to enter the residence and talk without traffic noise. The accused opened his front door wider and both men entered.

After he had entered, the first sergeant issued the following two orders to the accused:

> As your first sergeant I'm giving you an order now to come on back to the base with Sergeant Peterson [the accused's duty supervisor] and myself.

> I want you to clearly understand that I'm giving you a direct order to get dressed in your fatigues and accompany Tech Sergeant Peterson and myself back to the base. Do you understand?

The first order was given and refused twice, prior to issuance of the second order.

---

1. By exceptions, the accused was convicted of failing to have his hair present a tapered appearance in violation of Air Force Regulation 35–10 (18 July 1980), Dress and Personal Appearance of Air Force Personnel. The accused was acquitted of that portion of the same charge and specification which related to his failure to maintain his hair so that its bulk did not exceed 1 and ¼ inches.

2. A final charge, that of communicating a threat to bodily injure his first sergeant, in violation of Article 134, 10 U.S.C. § 934, was dismissed by the military judge as being "part and parcel" of the Article 91 offense.

The accused responded to the second order by saying that if he were given another order, somebody was going to get hurt.

Both the first sergeant and duty supervisor, "felt the presence of" another party observing them (in fact, this was true), and both believed the accused when he said that if another order was given, somebody would get hurt. Consequently, they immediately departed the premises and returned to the base.

On 25 January 1982, the accused voluntarily returned to the base and reported to his first sergeant, thus terminating his AWOL status. His commander immediately placed him in pretrial confinement. In accordance with Air Force Manual 111–1 (2 July 1973), Military Justice Guide, Paragraph 3–25, the staff judge advocate to the special court-martial convening authority conducted a pretrial confinement hearing. Based upon this hearing officer's recommendation, the convening authority ordered that the accused's pretrial confinement be continued until trial. The accused was not released from pretrial confinement prior to his conviction on 17 February 1982.

## I

■ We look first to the question of whether the pretrial confinement hearing in this case met the minimum Fourth Amendment requirement of such hearings, to wit, "the detached judgment of a neutral magistrate," *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54, 65 (1975). In view of the holding of *United States v. Lynch, supra,* we determine that it did not.

> [A] magistrate's decision based upon the advice of such a person [a staff judge advocate] cannot realistically be considered neutral and detached.
>
> \*　\*　\*　\*　\*　\*
>
> [A] commanding officer who refers cases to courts-martial must be considered similarly disqualified.

*Id.* at 396 and 397.

Although, *Lynch, supra,* clearly identifies this error, the guidance it offers concerning

application of its remedy for the error [3] is considerably less clear.

> [W]e apply our decision in this case prospectively to hearings on pretrial confinement conducted subsequent to the issuance of our mandate *and cases on granted petitions pending before this court.* [Emphasis added.]

*Id.* at 397.

The latter portion of this sentence is subject to two differing interpretations.

The first assumes that the Court, contrary to the holding of the United States Supreme Court in *United States v. Johnson,* —— U.S. ——, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), intended to carve out a prospective haven for those few cases in which an accused was fortunate enough to have appellate defense counsel, who not only raised this or some other issue to the Court of Military Appeals on the accused's behalf but also obtained a grant of review before the "magical" date of 2 August 1982.

The second, which we adopt, assumes no such intent on the part of the Court of Military Appeals. Rather, it presumes that the Court of Military Appeals chose to grant relief only on cases pending before it, because it presumed this Court would, in accordance with the reasons stated in *United States v. Johnson, supra,* faithfully apply the principles and remedies enunciated in *United States v. Lynch, supra,* to all cases undergoing appellate review in the Air Force judiciary system; cases over which we, rather than the Court of Military Appeals, currently maintain jurisdiction.

In *United States v. Johnson, supra,* the Supreme Court held that:

> [A] decision of this Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered.

*Id.,* at p. ——, 102 S.Ct. at p. 2594, 73 L.Ed.2d at p. 222.

---

**3.** The remedy applied in *United States v. Lynch,* 13 M.J. 394 (C.M.A. 1982), as enunciated in *United States v. Malia,* 6 M.J. 65 (C.M.A.

1978) was to credit the accused's approved sentence with time served for the period of his unlawful pretrial confinement.

Because *Gerstein v. Pugh, supra, Courtney v. Williams,* 1 M.J. 267 (C.M.A. 1976), and *United States v. Lynch, supra,* involve Fourth Amendment issues, the holding of *United States v. Johnson, supra,* is applicable.

Here, we perceive our judicial duties as applying the holding of the Court of Military Appeals in a manner that assures equal application of the rule to all accused similarly situated. The *Lynch, supra,* holding and the remedy afforded by the Court of Military Appeals will be applied not only in this case, but in all similar cases properly before this Court, wherein the convictions are not final.

Here, both the convening authority who acted as magistrate and his staff judge advocate, who conducted the pretrial confinement hearing and advised the convening authority, were, by definition under *Lynch, supra,* disqualified from performing these functions. Consequently, the convening authority's decision to continue the accused's incarceration was of no legal effect.

Before disposing of the remaining issues in this case, we order that the accused's approved sentence be credited with 21 days, the period of time from which the accused's release would have been required in the absence of a pretrial confinement hearing until he was, in fact, released.

## II

The next question we address is whether a lawful order to an absentee to return to duty will terminate his absence.

> The services have consistently held that return by the absentee to his duty station is not necessary to terminate an unauthorized absence status, and that termination is effected by any proper exercise of military control over the absentee. *United States v. Arthur,* 54 B.R. 159; *United States v. Lofton,* 18 B.R. (ETO) 139.

*United States v. Jackson,* 1 U.S.C.M.A. 190, 192, 2 C.M.R. 96, 98 (1952). *See, also, United States v. Raymo,* 1 M.J. 31 (C.M.A. 1975); *United States v. Pettis,* 12 M.J. 616 (N.M.C. M.R. 1981); *United States v. Moyer,* 11 M.J.

568 (A.F.C.M.R. 1981); *United States v. Coglin,* 10 M.J. 670 (A.C.M.R. 1981); *United States v. Sandell,* 9 M.J. 798 (N.C.M.R. 1980); *United States v. Baughman,* 8 M.J. 545 (C.G.C.M.R. 1979); *United States v. Rayle,* 6 M.J. 836 (N.C.M.R. 1979).

The Army Court of Military Review has gone a step further than *Jackson, supra,* saying that were an absentee to *voluntarily* attempt to surrender himself to military authority, even an unsuccessful *attempt* by that military authority to exercise military control over him would be sufficient to terminate his absence. *United States v. Coglin, supra,* 10 M.J. at p. 673. *See also, United States v. Moyer, supra,* 11 M.J. at p. 570.

Here, however, the accused was not attempting to voluntarily surrender to military authority. Rather, he told two superiors who had gone to his residence in an effort to convince him to terminate his absence that he would not do so. Further, he specifically refused to submit to his first sergeant's attempts to exercise military control over him by ordering him, first, to return to the base, and then to put on his uniform and accompany him back to the base.

■ In the absence of an attempt to voluntarily surrender, an AWOL may nevertheless be terminated by the absentee's submission to lawful military orders. *United States v. Raymo, supra,* 1 M.J. at p. 33. When he refuses to submit to such orders his absence is not terminated because, having thwarted an attempted exercise of military control over him, he was never under military control. *United States v. Coglin, supra,* 10 M.J. at p. 673; *United States v. Sandell, supra,* 9 M.J. at p. 800; *United States v. Gardenier,* No. 78 0894 (N.C.M.R. 16 November 1978) (unpublished).

■ Here, the accused was properly convicted of a four day absence without leave, despite his first sergeant's attempted exercise of control over him on the second day of that absence.

### III

Finally, we look to the question of whether the accused's disobedience of his first sergeant's order to dress and accompany him back to base constitutes an offense separately punishable from the AWOL offense.

In *United States v. Bratcher,* 19 U.S.C. M.A. 125, 39 C.M.R. 125 (1969), a case in which a conscientious objector refused to perform work, Private Bratcher's first sergeant took him to their executive officer. This superior commissioned officer, apparently trying to support the first sergeant's efforts to get Bratcher to work, twice ordered Bratcher to "perform duties as a duty soldier, the duties to be performed to be assigned by the first sergeant." Each time, Bratcher responded that he would not obey the order. Next, in the presence of the executive officer, the first sergeant ordered the accused to pick up a sickle and cut down some tall weeds at a particular location. Again, the accused indicated he would not obey. Although affirming the charge and specification dealing with disobedience of the first sergeant's order, the Court of Military Appeals dismissed the charge and specifications alleging disobedience of the orders issued by the executive officer. In doing so, the Court identified the crux of the issue to be the *nature* of the order given. According to the Court:

> The "order" in this case dealt with no specific subject as such but was only an exhortation to the accused to do his duty as a soldier. No order is needed for that.
>
> \*　\*　\*　\*　\*　\*
>
> The "command" contemplated by the offense of willful disobedience is an express and personal one, one of a specific character as distinguished from one of general scope.
>
> \*　\*　\*　\*　\*　\*

Just as an order placing one on restriction because of a belief that unless restricted he would commit a crime is unlawful, so too, an order to obey the law can have no validity beyond the limit of the ultimate offense committed. In short, ... [the

orders of the executive officer] in this case having no legal efficacy beyond the charge of disobedience of the First Sergeant's order ... fail to state an offense. [Citations omitted.]

*Id.* at p. 128, 128.

Subsequent to publication of this decision the Army Court of Military Review cited it for the proposition that failure to obey orders "to train," "to go to training," "to return to training," "to resume training," "to report to training," or "to start training with his unit" are not punishable under Article 90, U.C.M.J., 10 U.S.C. § 890, *United States v. Oldaker,* 41 C.M.R. 497 (A.C. M.R. 1968); *United States v. Gifford,* 41 C.M.R. 537 (A.C.M.R. 1969); *United States v. Wohletz,* 41 C.M.R. 728 (A.C.M.R. 1969); *United States v. Blackburn,* 42 C.M.R. 401 (A.C.M.R. 1970); *United States v. Orozco,* 42 C.M.R. 408 (A.C.M.R. 1970); *United States v. Stallings,* 42 C.M.R. 425, (A.C.M.R. 1970); *United States v. Lee,* 44 C.M.R. 417 (A.C.M.R. 1971); *United States v. Bethea,* 2 M.J. 892 (A.C.M.R. 1976). On the other hand, this same court cites the same case for the proposition that failure to obey orders "to attend training," "to put on his equipment and go to training," or "to return to his company and participate in unit training" are punishable, *United States v. Bagby,* 41 C.M.R. 729 (A.C.M.R. 1969); *United States v. Patten,* 43 C.M.R. 820 (A.C. M.R. 1971); *United States v. Couser,* 3 M.J. 561 (A.C.M.R. 1977).

In deciding each of these cases, the Army Court went behind the language of the specification, to determine on a case by case basis whether the order was discernible as placing the soldier under an obligation to perform some specific act, as opposed to merely exhorting him to obey the orders of others in a soldierly fashion. If a requirement to perform a specific act at the order's behest was discernible from the order, a soldier's failure to obey it was punishable; if not, a failure to obey was not punishable.

The Army Court has also cited *Bratcher, supra,* for the proposition that a soldier's failure to obey a *prospective* order of a superior to be at a given place at a given

time merges for punishment purposes with the "ultimate offense" of failure to repair, when such a soldier was, at the time the order was given, already obligated to report to duty at the same given place and given time. *United States v. Nelson,* 42 C.M.R. 877 (A.C.M.R. 1970); *United States v. Cowan,* 47 C.M.R. 519 (A.C.M.R. 1973). In *United States v. Quarles,* 1 M.J. 231 (C.M.A. 1975), the Court of Military Appeals affirmed this same proposition, as it had been adopted by the Navy court below, *United States v. Quarles,* 50 C.M.R. 514 (N.C.M.R. 1975).

A year prior to its *Quarles* decision, the Navy court, in *United States v. Rector,* 49 C.M.R. 117 (N.C.M.R. 1974), had recognized the fact that *Bratcher's* "ultimate offense" principle had no pertinence to situations in which a sailor failed, pursuant to a superior's order, to immediately report to a place where he had already failed to repair. Although reiterating this same position in *United States v. Pough,* 49 C.M.R. 363 (N.C.M.R. 1974), the Navy court, nevertheless, in dicta, added a slightly new "non-continuing offense" twist to it.

> Under these facts, the Gunnery Sergeant's order was more than a mere reminder to obey the law. Since the appellant's offense of wrongful failure to go at the appointed time to his appointed place of duty had already been committed, his willful refusal to get up out of his rack was not just a mere failure to go to that appointed place of duty. The additional offense that he was knowingly then committing by staying in his rack was willful disobedience of the direct lawful order he had received from his superior noncommissioned officer. It constituted a separate additional offense.
>
> \*    \*    \*    \*    \*    \*
>
> That staff noncommissioned officer was exercising his inherent authority as a troop leader as he personally confronted the appellant and he was not bereft of authority because the commission of another offense by the appellant was already complete. Appellant's first misdeed *which was not a continuing offense*

did not grant him license to remain in bed as long as he wished nor did it shield him with immunity from being separately called to task for refusing to obey a direct order to get up. [Emphasis added.]

*United States v. Pough, supra,* 49 C.M.R. at 365.

Finally, in 1979, the Judge Advocate General of the Navy certified the following question to the Navy Court of Military Review:

> May a person in an unauthorized absentee status who refuses an order to return to his ship be convicted of willful disobedience of a lawful command of his superior commissioned officer (Article 90, Uniform Code of Military Justice)?

*United States v. Chronister,* 8 M.J. 533, at 533 (N.C.M.R. 1979).

In an extraordinarily short opinion, citing only *United States v. Bratcher* and *United States v. Quarles,* both discussed *supra,* the Navy Court of Military Review responded that:

> [A] person in an unauthorized absentee status who refuses an order to return to his ship may be convicted of willful disobedience of a lawful command of his superior commissioned officer, *provided* that the subsequent disobedience does not escalate the punishment to which an accused otherwise would be subject. [Emphasis in original.]

*United States v. Chronister, supra,* at p. 534.

Both defense and government cite *Chronister, supra,* as the only published case that directly deals with *Bratcher's, supra,* applicability to charges of disobedience of orders stemming from directions to an absentee to terminate his absence, and the government concedes the defense's assertion that *Chronister, supra,* should control our decision here. We disagree.

Rather, we believe that the Navy court, possibly as a result of its earlier questionable assertions concerning the validity of orders to terminate continuing offenses in *Pough, supra,* erroneously concluded that the rationale of *Bratcher* applies to the

disobedience of any order that, if obeyed, would terminate an accused's commission of any separate offense.

Prior to *Pough, supra,* which stands alone in military jurisprudence for the proposition that *Bratcher, supra,* might be applicable to continuing offenses, no case had ever attempted to apply *Bratcher*'s "ultimate offense" rationale to a superior's direct verbal order to terminate an accused's on-going commission of a statutory offense.[4] For example, in *United States v. Caune,* 46 C.M.R. 598 (A.C.M.R. 1972), the Army Court of Military Review specifically held that an individual committing the offense of indecent exposure, through public nakedness, could be separately punished for refusal of an order during the period of such nakedness to get dressed. In fact, as we have already pointed out, all previous cases (and for that matter, the holding in *Pough, supra,* itself), had applied *Bratcher, supra,* only to those orders which either (1) did not levy any requirement to perform a specific discernible act upon an accused, or (2) as in the case of *Nelson, Cowan,* and *Quarles,* all *supra,* levied a requirement for a specific discernible act that the accused had already been obligated to perform.

■ In the case at bar, as in *Chronister* and *Caune,* both *supra,* the accused was under a non-specific general statutory obligation to terminate his continuing criminal activity. What is equally obvious to us, however, is that, in the language of *Pough, supra,* the accused's general obligation to stop committing a statutory offense neither granted him a license to continue committing that offense, nor did it strip his superiors of the authority to order him to engage in discernible specific acts that would *per force* require him to stop participating in that statutory offense.

A contrary decision in the instant case would distort the intentions of the Court of Military Appeals in *Bratcher, supra,* and *Quarles, supra,* to the point that, lacking authority to apprehend law breakers, noncommissioned officers would be bereft of *any* authority to order their subordinates to cease illegal activities committed in their very presence. Clearly, adverse effects resulting, for example, from a troop leader's inability to order a stop to affrays between members of his unit, occurring in the presence of both him and other troops assigned to his unit, would be absurdly devastating to good order and discipline within the armed forces. Certainly, *United States v. Trottier,* 9 M.J. 337 (C.M.A. 1980), disavows any such intent on the part of the military's highest court.

■ Consequently, contrary to the Navy's ruling in *Chronister, supra,* we hold that a person in an unauthorized absentee status who refuses an order to return to his duty station may be both convicted and separately punished for willful disobedience of a lawful command of his superior noncommissioned officer and his AWOL offense.[5]

From our examination of the entire record of trial, the assignment of errors, and the government's reply thereto, we conclude that, with the sole exception of the previously ordered credit for the 21 days spent in illegal pretrial confinement, the findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the accused was committed.

---

4. The applicability of *United States v. Bratcher,* 19 U.S.C.M.A. 125, 39 C.M.R. 125 (1969), has always been restricted to orders to obey already existing orders, whether violation of those already existing orders be punishable under Articles 90 or 91, Uniform Code of Military Justice, *Id.,* or punishable under Article 92, Uniform Code of Military Justice. *United States v. Quarles,* 1 M.J. 231 (C.M.A. 1975).

5. Conceptually this conclusion dovetails nicely with our earlier conclusion that a service member must "submit" to military control before he can terminate an unauthorized absence. Although such a service member is not "under" military control during an unauthorized absence, he remains "subject to" military control throughout it. When he finally "submits" to this military control that he has remained continually "subject to" his act of "submission" places him in the category of being "under" military control, which in turn terminates his absence.

Accordingly the findings and sentence, as modified, are

AFFIRMED.

POWELL, Senior Judge, concurs.

HODGSON, Chief Judge (concurring in part and dissenting in part):

My disagreement with Judge Miller's able majority opinion concerns how *United States v. Lynch,* 13 M.J. 394 (C.M.A. 1982), is to be applied.

The Court of Military Appeals is the supreme court of the military justice system and its decisions are binding on the Courts of Military Review, subject only to review by the Supreme Court of the United States on constitutional issues. *United States v. Armbruster,* 11 U.S.C.M.A. 596, 29 C.M.R. 412 (1960); *United States v. Wheeler,* 27 C.M.R. 981 (A.F.B.R. 1959). We, as an intermediate appellate court, must look to the plain language of those decisions for guidance in applying them.

While requiring the Air Force to modify its current procedures for imposing pretrial detention, the Court of Military Appeals repeatedly indicated that the present procedures do not operate "unfairly." The inference to be drawn is the present practices have not operated "unfairly" in the past, but they lack perceived fairness. The Court held pretrial confinement ordered by an officer exercising special court-martial jurisdiction to be unlawful. Accordingly, the Court of Military Appeals announced new standards and stated they would be applied:

> prospectively to hearings on pretrial confinement conducted subsequent to the issuance of our mandate and cases on granted petitions before this court.

*United States v. Lynch, supra,* 13 M.J. at 397.

The Court of Military Appeals may, if it wishes, limit the granted relief to a particular class and those accused whose cases were chosen as the vehicle for establishing the new standard. *See, Desist v. United States,* 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969). It is clear to me that the Court of Military Appeals did so by the language quoted above.

In my opinion, the accused before us is not entitled to credit for time served in pretrial confinement.