**Norman CLOUD, Petitioner,**

v.

**Charles SCULLY and Robert Abrams, Attorney General of the State of New York, Respondents.**

**No. 82 Civ. 3274 (WCC).**

United States District Court, S.D. New York.

Aug. 5, 1983.

Norman Cloud, petitioner, pro se.

Robert M. Morgenthau, Dist. Atty. for N.Y. County, New York City, for respondents; Amy Jane Rettew, Joyce Adolfsen, Asst. Dist. Attys., New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge.

Norman Cloud ("Cloud"), currently incarcerated at the Auburn Correctional Facility, has petitioned this Court for a writ of habeas corpus to obtain his release from the custody of the State of New York. On January 12, 1978, petitioner was sentenced to a term of imprisonment of from fifteen years to life following his conviction by a jury on a charge of murder in the second degree. Cloud also pleaded guilty to two counts of robbery in the first degree for which he received terms of imprisonment of six to eighteen years, both to run concurrently with the sentence on the murder conviction.

Following his sentencing, petitioner moved pursuant to § 440.10 of the New York Criminal Procedure law to vacate his conviction on the ground that he had been

denied effective assistance of counsel at the pretrial suppression hearing. That motion was denied on March 21, 1979. Cloud then appealed his convictions to the Appellate Division, First Department, which affirmed the convictions without opinion on March 6, 1980. On June 27, 1980, Judge Bernard Meyer denied petitioner's application for leave to appeal to the New York Court of Appeals.

Petitioner now challenges the constitutionality of his convictions on three grounds. First, he contends that he was denied his right to effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Second, he claims that the circumstances of his warrantless arrest violated rights protected by the Fourth Amendment. Finally, Cloud asserts that his inculpatory post-arrest statements were involuntarily rendered and, consequently, should have been suppressed. Because I conclude that petitioner has not exhausted his available state court remedies concerning the constitutionality of his arrest, see 28 U.S.C. §§ 2254(b)–(c), the entire petition must be dismissed pursuant to the Supreme Court's mandate in *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

*Background*

The drama surrounding petitioner's arrest involves a scenario which might well have come from a grade-B Hollywood movie. In the early morning hours of October 6, 1977, the police received a tip from Monk Corachio, who had just been arrested on a weapons charge, concerning the September 30, 1976 murder of a grocery store clerk during the course of a robbery at 366 Second Avenue. Corachio informed the police that the murder had been committed by a man known to him as "Moose," who could be found in Room 908 of the Holiday Inn on West 57th Street in Manhattan. See Tr. 145–54. He indicated to Police Officer Baezler that he had been in Moose's hotel room just two days earlier and had been shown a .38 caliber gun which Moose stated

he had stolen from a supermarket guard during a prior robbery and had subsequently used to shoot the grocery store clerk. See Tr. at 152. According to Officer Baezler, Corachio also told him that in addition to the .38 caliber gun, there were two shotguns in the hotel room. See Tr. at 153–54.

Following verification of Corachio's information, six or seven police detectives proceeded to the Holiday Inn, arriving at approximately 10:45 A.M. See Tr. at 20. Led by Sergeant Makon, the detectives went straight to the ninth floor, where they questioned Mrs. Turner, the chambermaid. According to Sergeant Makon, Mrs. Turner described the occupants of Room 908 as one black male in his early twenties, standing about six feet tall and weighing approximately 200 pounds, a white male in his mid-twenties and several white females. See Tr. at 22–23. Mrs. Turner's description of the black male matched both the description of Moose given by Corachio and the descriptions of the suspect in the Second Avenue delicatessen murder given to police by witnesses.

After obtaining a pass key from Mrs. Turner, the detectives attempted unsuccessfully to enter Room 908.[1] Mrs. Turner then let the detectives into Room 910, where they attempted to telephone Room 908 in an effort to flush the suspects. That ruse failed, however, because the telephone line to Room 908 was busy. See Tr. at 25. The police detectives next tried to gain entrance to Room 908 by posing as hotel maintenance men. That pretext also failed. See Tr. at 25–26.

After this third unsuccessful attempt at deception, the detectives finally entered Room 908 by a more direct route: they kicked in the connecting door between Rooms 908 and 910. See Tr. at 26–27. The actual kicking was done by Detective Connally, who was equipped with a bullet-proof vest and a double-barrel shotgun. See Tr. at 180–81. As the officers entered with their guns drawn, see Tr. at 29, petitioner, clothed only in his underwear, began to rise

---

1. At trial, Sergeant Makon could not recall why the pass key did not work, but he presumed

that it was because the door was chained as well as locked. See Tr. at 24.

from the bed to the detectives' left and another male, later identified as Robert Nappe, started to get out of the bed to their right. As Cloud made a move toward a revolver located in plain view on the second shelf of a bedside table, Sergeant Makon rushed forward, grabbed his wrist and forced him back on the bed. See Tr. at 33. At gunpoint, both Cloud and Nappe were handcuffed by the officers. See Tr. at 34.

At the time the detectives burst into Room 908, there were also two other persons, a 13-year-old male and an 18-year-old female, in the room. According to Sergeant Makon, the female, who at the time of the police invasion was undressed, asked the officers for her clothes and pointed toward the dresser. When Detective Makon opened the lower left dresser drawer in an attempt to retrieve the woman's clothes, he saw two sawed-off shotguns which he promptly seized. See Tr. at 37.

Immediately after his arrest, petitioner was taken to the First Homicide Zone offices in the 13th Precinct. After being advised of his rights, see Tr. at 287, Cloud was questioned by Detective Ferrick. During the course of that interrogation, petitioner admitted that he had shot the grocery clerk. Detective Ferrick reduced Cloud's statement to writing and asked petitioner to sign it; however, Cloud stated that he was unable to read or write. The detective then read the written statement to petitioner who acknowledged that it was correct and printed his name underneath it. See Tr. at 300–03. Later that evening, Assistant District Attorney Mirabile was called to the police station to interview Cloud. Under Mirabile's questioning, in the presence of Detective Ferrick and a stenographer, petitioner again admitted shooting the grocery clerk. See Respondent's Ex. B at 12. During the course of Mirabile's interview, petitioner also confessed, *inter alia,* to having committed at least three other

armed robberies of grocery stores or supermarkets. See *generally* Respondent's Ex. B.

Prior to the commencement of petitioner's trial, the court held a hearing on Cloud's motions to suppress his post-arrest statements and the weapons seized by the police from his hotel room. Those motions were denied by the court and both the weapons [2] and the statements were admitted at trial against Cloud. See Tr. at 559–61.

*Discussion*

At the time of both Cloud's arrest and his trial, New York law authorized a police officer to enter a dwelling without first obtaining a warrant in order to arrest someone he had probable cause to believe had committed a crime. N.Y.Crim. Proc.Law § 140.15 (McKinney 1981). So long as the officer reasonably believed that the person he sought would be present, he was authorized to enter the premises in the same manner as if he had obtained a warrant. *Id.* at § 140.15(4). While Cloud's application for leave to appeal his convictions to the New York Court of Appeals was pending before Judge Meyer, however, the United States Supreme Court in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), held this application of New York's warrantless arrest statute to be unconstitutional. The Court ruled in *Payton* that absent exigent circumstances, the police may not enter a home [3] to make an arrest without first obtaining a warrant. See *id.* at 590, 602–03, 100 S.Ct. at 1382, 1388–1389.

In the immediate aftermath of *Payton,* courts were uncertain whether the newly announced constitutional rule should be applied to arrests which occurred prior to the date of the Court's decision. This past year, in *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), the Court removed this uncertainty by an-

---

**2.** The only weapon relevant to the murder charge was the revolver. The shotguns, found inside the dresser, were connected to the other robberies for which Cloud was indicted.

**3.** Cloud's hotel room is, for purposes of Fourth Amendment analysis, the equivalent of his home. See *Stoner v. California,* 376 U.S. 483, 489–90, 84 S.Ct. 889, 893–894, 11 L.Ed.2d 856 (1964).

nouncing that the rule in *Payton* must be applied retroactively to all cases still pending on direct appeal at the time when *Payton* was decided. *Id.* Since the detectives never attempted to secure an arrest warrant prior to breaking into Cloud's hotel room, it is clear in light of *Payton* and *Johnson* that Cloud's arrest can only be upheld if there existed exigent circumstances to justify the detectives' warrantless entry. Moreover, it is equally apparent that if the entry and arrest were unconstitutional, Cloud's post-arrest statements and the guns seized in the hotel room would have to be suppressed as "fruits" of the officers' unlawful action. See *Wong Sun v. United States,* 371 U.S. 471, 484–91, 83 S.Ct. 407, 415–419, 9 L.Ed.2d 441 (1963). Without that evidence, Cloud's convictions could not stand.

It would be impossible for this Court to rule on the merits of Cloud's petition without first giving respondents an opportunity to develop at an evidentiary hearing that exigent circumstances justified the warrantless entry into the hotel room. Although the record of the suppression hearing reflects generally the conditions existing at the time the detectives burst into the hotel room, because the prosecution was relying on § 140.15 it had no motive to develop for the record the existence of exigent circumstances justifying the warrantless arrest. Thus, the Court would not presume, absent a hearing, that such circumstances did not exist. On the basis of the present state of the record, however, the Court would be hard pressed to rule that the detectives' actions were justified. When asked by the court at the suppression hearing about his failure to obtain a warrant, Sergeant Makon stated that because checkout time in the hotel was noon, the detectives were concerned that they would not be able to obtain a warrant and return to the room by that time. See Tr. at 24. It apparently never occurred to the officers that while one detective went to obtain an arrest warrant, the others could remain outside the door to Room 908 and arrest petitioner if he attempted to leave.

■ The Court may not reach this issue in the instant case, however, because Cloud must first pursue his remedies in the New York state courts before requesting federal habeas corpus relief. As interpreted by the Supreme Court in *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), the exhaustion requirement of 28 U.S.C. § 2254 is satisfied only where the federal habeas petitioner has "fairly presented" his federal claims to the state courts. See *id.* at 275, 92 S.Ct. at 512. Fair presentation requires that the petitioner argue before the state courts the same factual and legal basis for the claim he contends provides a basis for habeas corpus relief. See *id.* at 276–78, 92 S.Ct. at 512–513. As the Court pointed out in *Picard,* the exhaustion rule reflects an important policy of federal-state comity. " '[I]t would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation.' " *Id.* at 275, 92 S.Ct. at 512, *quoting Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950).

■ The exhaustion rule does not, however, require a petitioner to pursue every available avenue of appellate review before he can maintain his federal petition. See *Barnes v. Jones,* 665 F.2d 427, 432 (2d Cir.1981), *rev'd on other grounds, Jones v. Barnes,* —— U.S. ——, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Once he has properly presented his claim to the state courts on direct review, the petitioner will normally be found to have satisfied his exhaustion burden. See *id.* However, where an intervening change in federal law casts the legal issue previously presented to the state court in a fundamentally different light, the petitioner must pursue any available state post-conviction remedies before a federal court will consider his claims. See *James v. Copinger,* 428 F.2d 235, 241–42 (4th Cir.1970); *Blair v. California,* 340 F.2d 741, 744 (9th Cir.1965); see also *Picard, supra,* 404 U.S. at 276, 92 S.Ct. at 512–513.

The instant case presents precisely this latter situation. Although *Payton* was decided while Cloud's case was still pending on direct review, awaiting leave to appeal to the New York Court of Appeals, that decision did not, of itself, signal a change in the law applicable to Cloud's arrest.[4] As noted above, it was far from clear that *Payton* was to have any retroactive effect. Indeed, two New York courts that considered the issue reasoned, on the basis of federal authorities, that the constitutional rule announced in *Payton* would not apply to an arrest, such as Cloud's, which occurred well prior to the Supreme Court's decision on October 15, 1980. See *People v. Benthall,* 112 Misc.2d 731, 447 N.Y.S.2d 652, 654 (Sup.Ct.N.Y.Co.1982); *People v. Beckford,* 102 Misc.2d 963, 427 N.Y.S.2d 908, 910–11 (Sup.Ct.Bx.Co.1980). Thus, the intervening change in the constitutional law applicable to Cloud's case was settled not at the time *Payton* was decided, but only when *Johnson* was handed down. Since this occurred after direct review of Cloud's conviction was completed, it follows that New York courts have not been given an opportunity to consider Cloud's argument in light of the change in governing federal law.

The principles of comity underlying the exhaustion rule require that Cloud present his claim, in light of *Johnson,* to the New York courts before this Court will consider the matter. See *Blair, supra,* 340 F.2d at 744. There is no reason to believe that the state courts will not fully and fairly adjudicate Cloud's rights in view of the intervening change in the governing constitutional principle. Moreover, as a practical matter, it is preferable for the state court, which has already conducted extensive proceedings in this matter, to hold the hearing on whether exigent circumstances existed to justify the detectives' warrantless actions. Under §§ 440.10(1)(h) and (2)(a), petitioner clearly has a practical procedure for resolving this issue in the New York State courts.

Accordingly, because Cloud has not exhausted his challenge to the constitutionality of his warrantless arrest, the entire petition must be dismissed.[5]

SO ORDERED.

---

4. If the date *Payton* was decided is to be considered the time of the change in applicable law, the Court's result here would be different. Since *Payton* was itself decided prior to final review of Cloud's direct appeal, the Court would be forced to conclude that the New York courts had been given a full and fair opportunity to consider Cloud's challenge in light of the newly announced rule. Respondent's argument that Cloud was somehow obligated to bring the Supreme Court's reversal of *People v. Payton* to Judge Meyer's attention, and was required to argue explicitly for the applicability of some specific cases, is not persuasive. While a good lawyer might have brought the Supreme Court's decision in *Payton* to the judge's attention and might also have made the cogent legal arguments noted by respondent, the exhaustion rule of § 2254 requires only that the petitioner have presented the legal and factual bases for his federal claim to the state courts. Cloud's appellate briefs could not have stated more clearly that he was challenging the constitutionality of his warrantless arrest under the Fourth Amendment. A full and fair presentation requires nothing more. See *Hudson v. Rushen,* 686 F.2d 826, 830 (9th Cir.1982) ("exhaustion requirement does not bar admission to the federal courts until the state courts have explicitly considered every relevant federal case"). Moreover, respondent's argument that Cloud was required to bring *Payton* to the attention of Judge Meyer irrationally assumes that Judge Meyer, a respected Judge of the New York Court of Appeals, would not have been aware of a recent Supreme Court ruling reversing a prior decision of his court, and thus that he denied Cloud leave to appeal in ignorance of that reversal.

5. In view of this determination, the Court will not consider the merits of any of petitioner's claims.