Charles **GILMORE**

v.

Ronald **MARKS**, et al.

Civ. A. No. 84–4008.

United States District Court, E.D. Pennsylvania.

July 17, 1985.

Burton A. Rose, Philadelphia, Pa., for petitioner.

Andrew R. Rogoff, Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

This is a petition for a writ of habeas corpus. Petitioner was convicted of first degree murder and robbery in 1979 after a non-jury trial before the Honorable Charles P. Mirarchi, Jr. of the Court of Common Pleas of Philadelphia. He was sentenced to a term of life imprisonment for the murder and a concurrent sentence of ten to twenty years' imprisonment for the robbery. On direct appeal, the Supreme Court of Pennsylvania affirmed the judgment of sentence. *Commonwealth v. Gilmore,* 496 Pa. 420, 437 A.2d 944 (1981).

Petitioner then filed a petition for writ of certiorari with the United States Supreme Court alleging that the Pennsylvania Supreme Court erred in refusing to apply the rule of *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) to petitioner's warrantless arrest. Petitioner argued that had the court applied *Payton,* statements he made after his arrest would have been suppressed. The Court granted the writ, vacated petitioner's sentence, and remanded the case to the Pennsylvania Supreme Court for further consideration in light of its recent decision in *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). *Gilmore v. Pennsylvania,* 458 U.S. 1103, 102 S.Ct. 3476, 73 L.Ed.2d 1363 (1982). In the *Johnson* case, the Court decided to apply *Payton* retroactively to cases, like petitioner's, that were still pending on direct appeal at the time *Payton* was decided. *Johnson, supra,* at 554, 102 S.Ct. at 2589. The *Payton* case announced the principle that "the Fourth Amendment ... prohibits the police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest." 445 U.S. at 576, 100 S.Ct. at 1375.

On remand, the Pennsylvania Supreme Court disposed of petitioner's case with a cryptic *per curiam* order: "Judgments of sentence affirmed. See *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978) (harmless error)." *Commonwealth v. Gilmore,* 500 Pa. 319, 456 A.2d 148 (1983). Petitioner then filed the present petition arguing that the Pennsylvania Supreme Court denied him fundamental fairness when it wrongfully determined that the error was harmless. Petitioner specifically noted that while he was objecting to the Pennsylvania Supreme Court's finding of harmlessness, he was not asking this court to address the fourth amendment issue which formed the basis of the Supreme Court's finding of error.

In reviewing petitioner's allegations, the magistrate to whom this matter was referred was troubled by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). That case held that collateral review of a fourth amendment issue is barred when a state court has provided a full and fair opportunity to litigate the question. The magistrate determined:

> ... [T]he petitioner cleverly attempts to camouflage the fourth amendment nature of his claim in a chameleon-like fashion with the hope of circumventing the deeply entrenched precedent of *Stone v. Powell,* 428 U.S. 465 [96 S.Ct. 3037, 49 L.Ed.2d 1067] (1976). However, a trained eye can easily detect a lizard amidst the foliage.

Report and Recommendation at 2–3. I disagree with the magistrate's analysis. It would take a well-trained eye indeed to create a fourth amendment lizard when none existed.

The Pennsylvania Supreme Court's one sentence disposition tells me absolutely nothing about the court's reasoning, except that there was "harmless error." Therefore, in order to translate the court's utterance into a meaningful holding, it is necessary to walk through a series of logical steps:

1. The Supreme Court remanded to the Pennsylvania court with directions to reconsider its previous ruling in the light of *United States v. Johnson, supra.*

2. I must assume that the Pennsylvania court heeded the command of the Supreme Court. In its finding of "error", the court implicitly found that *Payton* was retroactively applicable to *Gilmore (Johnson)*, and that the arrest was illegal (*Payton*).

3. By characterizing the admission of the statements as "error", the court also found them to be tainted as "the fruit of the poisonous tree," *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939), and concluded that the connection between the statements and the unlawful arrest was not so attenuated as to remove the taint. *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Were it otherwise, their admission would not have been error. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

The Pennsylvania Supreme Court has given the Commonwealth a fair opportunity to be heard; has found the arrest illegal, and the acquisition of the statements to be violative of the fourth amendment; and has determined their admission into evidence to be error. Under *Stone v. Powell, supra*, I am foreclosed from re-examining that determination. I apprehend that under the equal justice philosophy of the United States, *Stone* is not a one-way street and its strictures apply equally to the government and to a defendant. Therefore, the determination has been made that there was a fourth amendment violation resulting in trial error. This determination, however, does not end the case. I still must determine whether the error was harmless, a question not embraced by *Stone*.

■ The Commonwealth asserts that because there is fair factual support in the record for the state court's finding of harmlessness, this court must be bound by it. I disagree. Because a finding of harmless error is a mixed question of law and fact, rather than a pure question of fact, I am not bound to accord to the state court's finding "the presumption of correctness" pursuant to 28 U.S.C. § 2254(d). *See, e.g., Hagler v. Callahan*, 764 F.2d 711 (9th Cir.

1985); *Grizzell v. Wainwright*, 692 F.2d 722, 725 (11th Cir.1982), *cert. denied*, 461 U.S. 948, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983).

■ The statements that the Pennsylvania Supreme Court deemed to be harmless were made by petitioner after his warrantless arrest on the evening of July 13, 1978. He was taken to the Police Administration Building and questioned concerning the 1973 homicide of Ollie Chesson, Jr. Petitioner initially denied knowledge of the murder, but later confessed in pertinent part as follows:

> Before I got there to Girard Avenue I saw a guy laying on the ground. I knew the guy. His name was Ollie, and I started going through his pockets. Mike came up while I was going through his pockets, and he started checking him too. Ollie woke up and sat up, and Mike hit him in the head with the cane. Mike was trying to get into Ollie's back pocket, but he couldn't get into it. He felt something in his pocket. Mike knew I had a knife on me and he asked me for it. I gave it to him and he cut him. I ran across the street and stood near the church, then Mike came across.... I got the knife back from Mike the next day—no, I don't think it was the next day, but I got it back.

Trial transcript 2.61–62. He also explained that he thought "Mike" was going to use the knife "to cut [the victim's] pocket out 'cause he had felt something." Trial transcript 2.64. After petitioner read and signed the above statement, he was granted permission to call his mother. A police officer alleged at trial that petitioner then made the following statement over the telephone:

> We was robbin' the man, and I had a knife. Big Mike knew I had a knife. He told me to give him the knife so he could slash the dude's pockets. Then I seen him kill the dude with the knife I gave him.

Trial transcript 2.67. Both these statements were admitted at petitioner's trial.

With the exception of the statements, the evidence linking petitioner to the robbery and murder was non-existent. A police officer testified that Mr. Chesson told him he was "robbed by two Negro males that he had been shooting dice with in Fairmount Park earlier in the evening." Trial transcript 1.31–32. No evidence was introduced suggesting that petitioner was one of the players. Two police officers also testified that as a result of interviews with two people regarding the death of Michael Needham, they decided to question petitioner in connection with the murder of Mr. Chesson. Trial transcript 2.20, 2.48. The two people whom the police interviewed were never produced to testify and the substance of their interviews does not appear in the trial record. Finally, police testified that petitioner was or may have been a member of the "Four Corners Gang," a group that allegedly controlled the area in which Mr. Chesson was murdered. Trial transcript 2.24, 2.70. In sum, aside from the statements in question, the Commonwealth presented no evidence linking Gilmore to the crimes. Where the only evidence pointing to guilt consists of illegally obtained statements, it is difficult, if not impossible, to conceive of any circumstances in which the admission of such statements could be more harmful.

The petitioner took the stand in his own defense. On direct examination, petitioner stated that when he saw Mr. Chesson lying on a step in an intoxicated state, he decided to check his pockets for money. He testified:

A. Well, I went in his pocket, and Mike had walked up, and he like came and took over the whole situation.

Q. Well, explain that; what do you mean "he took over the whole situation"?

A. He like told me to get back, probably thinking I would find something before he did.

Q. All right, what happened?

A. I got back.

Q. When you say "you got back," what do you mean?

A. I stepped away from him. I stepped back towards the curb up against a car.

Q. All right. What happened?

A. He started going through his pockets, and Ollie started waking up. He sat up, and Mike hit him with the cane he had.

Q. What happened when he hit him?

A. The guy fell back down.

Q. What happened to the cane?

A. The cane broke.

Q. What happened next?

A. He threw the piece that he had left in his hand. He threw that down, continued going through his pockets. He couldn't get into his back pocket and he knew that I had a knife on me. So he asked me to give him the knife. I looked at him kind of surprised and shocked because like he was known for like surprises like that, you know, hurt people and things like that. And like he asked me for the knife; and I gave him the knife after he asked me the second time, because he said he was only going to cut his pocket out.

When I handed him the knife, he cut him on the shoulder and his neck.

Trial transcript 2.78–2.80. Petitioner further testified that he ran across the street the minute Mike stabbed the victim and that he had handed over his knife because he was afraid of Mike. Trial transcript 2.80, 2.81–82. Petitioner was fifteen at the time the crime was committed. Trial transcript 2.76. Mike (Michael Needham) was several years older, a leader in a local gang, and described as "vicious". Trial transcript at 2.76–78, 2.89, 2.23.

Whether petitioner's testimony was itself inculpatory is immaterial. It suffered from the same infirmity that infected the statements. In *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), Mr. Justice Holmes said:

The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired

shall not be used before the court, but that it shall not be used at all.

*Id.* at 392, 40 S.Ct. at 183.

In *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the Court applied Justice Holmes' reasoning in a case strikingly similar to the present one. The defendant was convicted of murder after a jury trial in the United States District Court for the District of Columbia. At the trial, three confessions allegedly made by the defendant while in police custody were admitted in evidence. The defendant, on the advice of counsel, then took the witness stand and testified to his own version of the events leading to the victim's death, which testimony placed the defendant, shotgun in hand, at the scene of the killing. The confessions were held to have been illegally obtained. On re-trial, the defendant's trial testimony was admitted into evidence. In reversing the conviction, the Court said at pages 222–23:

> Here, however, the petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree, to invoke a time-worn metaphor.
>
> .... The question is not *whether* the petitioner made a knowing decision to testify, buy *why*. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible.

The Court concluded at pages 224–26:

> The remaining question is whether the petitioner's trial testimony was in fact impelled by the prosecution's wrongful use of his illegally obtained confessions.... But, having illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not been used....

> Having "released the spring" by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony.

> .... Only after his confessions had been admitted in evidence did he take the stand. It thus appears that, but for the use of his confessions, the petitioner might not have testified at all. But even if the petitioner would have decided to testify whether or not his confessions had been used, it does not follow that he would have admitted being at the scene of the crime and holding the gun when the fatal shot was fired. On the contrary, the more natural inference is that no testimonial admissions so damaging would have been made if the prosecutor had not already spread the petitioner's confessions before the jury. That is an inference the Government has not dispelled.

> It has not been demonstrated, therefore, that the petitioner's testimony was obtained "by means sufficiently distinguishable" from the underlying illegality "to be purged of the primary taint."

All of the above factors dispel any notion that the statements were harmless beyond a reasonable doubt as required by *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This conclusion is underlined by the trial judge's own heavy reliance on the statements in his opinion supporting the verdict. For example, the judge stated:

> Whether MICHAEL NEEDHAM was involved initially or joined after the defendant commenced his theft is not material. What is essential is that they acted together. When MICHAEL NEEDHAM struck OLLIE CHESSON, JR. over the head, defendant continued searching the victim's pockets.

Opinion at 4 (September 9, 1980). This version of the crime can only arise from petitioner's confession and is in direct conflict with petitioner's trial testimony. Similarly, the judge later stated that "both actors continued in their thievery" after

Mike hit the victim over the head. Opinion at 5. In addition, the judge asserted: "When MICHAEL NEEDHAM stabbed CHESSON more than fifty times with defendant's knife, defendant not only continued with his participation of the robbery/murder, he retrieved and later sold his knife." Opinion at 4. This rendition of the facts ignores the petitioner's trial testimony that he left the scene of the crime as soon as the first wound was inflicted. Moreover, the trial judge's knowledge of petitioner's sale of the knife came from petitioner's confession, not from the testimony at trial.

Since the admissions were not harmless and since I must accept the Pennsylvania Supreme Court's finding of error on the fourth amendment issue, I shall grant petitioner's writ. Actual issuance of the writ will be stayed for a period of thirty days to permit an appeal, and if an appeal is taken, for a further period until the appeal is finally decided. Unless the Commonwealth shall re-try petitioner within sixty (60) days following the issuance of the writ, the petitioner shall be released from custody. There is probable cause for appeal.